[Crim. No. 6706.   Second Dist., Div. Two.   Sept. 8, 1959.]

THE PEOPLE, Respondent, v. ARTHUR CHARLES CARNES et al., Defendants; WILLIAM JOHN MILLER, Appellant.

Edward L. Lacy for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendants were jointly charged with the crime of burglary in violation of section 459 of the Penal Code.

The jury returned verdicts finding both defendants guilty of burglary in the second degree. Motions of defendants for a new trial were denied; proceedings were suspended, and both were granted probation for five years upon conditions, among others, that each spend the first 60 days of his probationary period in the county jail. Defendant Miller, hereinafter referred to as appellant, has appealed from the order granting probation and the order denying his motion for a new trial. (Defendant Carnes apparently has not taken an appeal.)

Viewing the record in the light most favorable to the People (*People* v. *Caritativo*, 46 Cal.2d 68, 70 [292 P.2d 513]), it discloses that on the evening of July 18, 1958, the dental laboratory of Floyd E. Wolfsen, at 513 South Western Avenue, Los Angeles, was broken into. Mr. Wolfsen was notified of this burglary between 1:30 and 2 o'clock the next morning (July 19th) by the police. Upon his arrival at his place of business he found that some holes had been drilled in the back door and the door had been "broken down." A cabinet in his private office had been pried open and most of the drawers in his desk were open and the papers in disarray. There were missing from his desk a book of "green stamps" and an envelope bearing Mr. Wolfsen's name which contained some loose "green stamps." In addition to these items, Mr. Wolfsen observed that a General Electric FM radio was also missing; a few days later it was discovered that a chamois skin, a Los Angeles Street Guide, a half-full bottle of Scotch whiskey, and a "couple of pair of pliers or tongs" were also missing.

At approximately 11:30 p. m., on the night of the burglary, Officers Bolander and Downey, of the Beverly Hills Police Department, were patrolling northbound on Doheny just south of Wilshire Boulevard. This particular block on Doheny was illuminated with the "latest type mercury lights." The officers' car was painted with the black and white markings of a police vehicle, and a pair of red lights and a siren

were mounted on its top. As the officers proceeded northward Officer Bolander observed two men in a vehicle approaching them southbound on Doheny at a distance of approximately 100 yards. The men appeared to be looking at the police car and immediately thereafter they made a left turn into an alley. Officer Bolander thereupon turned on the red lights and followed the car down the alley, a distance of about 350 feet, where it made another left turn at the next street. The car was then stopped by the police officers through the use of their spotlight. Officer Bolander approached the vehicle on the driver's side, while Officer Downey went to the passenger side. As they did so, appellant Miller, the driver, and Carnes opened the car doors and stepped out on the street. Officer Bolander questioned Miller about his destination and the ownership of the car. Miller indicated that the car was his and that he was en route to visit some friends in the vicinity.

Officer Bolander next turned his attention to the car, and, while on the outside, "shined" his flashlight "in the back seat." On the floor of the back seat Officer Bolander observed a radio (subsequently identified as the one missing from the Wolfsen laboratory), a brace and bit, and a length of half-inch rope. Officer Bolander also observed a "pry-bar" between the door and the front seat on the driver's side, and on the back seat he saw a flashlight and a pair of white cotton gloves. After observing the above-mentioned articles in the car, Officer Bolander asked Miller what purpose he had in carrying these tools. Miller replied that he was a typewriter repairman and that he used them in his business. Miller and Carnes were then advised that they were under arrest for "suspicion of burglary." Officer Bolander then obtained the car keys from Miller and conducted a search of the vehicle. In the glove compartment, which was locked, the officer found a white-handled 7.65 millimeter automatic pistol, which was of German make. Another pry-bar and a second pair of gloves were found under the front seat; also, a "half a bottle" of Scotch was found on the right front floor. An atlas of Los Angeles County, an envelope containing some green stamps, and a book of green stamps were found on the front seat of the vehicle. (The envelope and the green stamps therein were identified as being those missing from the Wolfsen laboratory.) In thus searching their automobile the police were acting without an arrest or search warrant.

Appellant was further questioned at the scene of the ar-

rest by Officer Bolander regarding the articles found in his car. He claimed ownership of the radio and the tools but denied any knowledge of the green stamps found on the front seat and the automatic pistol in the glove compartment. At this time, apparently defendant Carnes was questioned only about the gun and green stamps. He denied knowledge of either of them. Miller and Carnes were transferred to the Beverly Hills Police Station and there separately interrogated by Captain Smith in the presence of Officer Downey. Appellant was interrogated about the materials found in his car. He stated that he knew nothing about any of these things and that he had found them in his car, which he had parked behind a building near Western Avenue, when he and his friend had returned from having a drink. Officer Downey reminded appellant that he had previously claimed ownership of the tools and the radio. Appellant then stated that some of the tools were his, but that he didn't know anything about the radio. Carnes denied any knowledge of the items found in the automobile. He stated that he and appellant had parked, and had gone to get a drink, and that when they returned the items were in the car.

Miller and Carnes were again questioned during the afternoon of July 19th by Officer Stevens of the Los Angeles Police Department. Miller at first denied any knowledge of the articles found in his car but upon further questioning stated that he and Carnes had drilled some holes in the rear door of Wolfsen's establishment and that they entered and took the radio, the green stamps and a chamois skin. Miller denied any knowledge of the gun found in the glove compartment of his car. Carnes, upon being questioned, stated that he knew nothing about the articles in the car other than that he and Miller had found them "piled" in the car when they returned from having a beer near where he worked at 5th and Western. He also denied any knowledge of the gun found in the glove compartment.

As part of the police investigation, chips of wood found at the Wolfsen laboratory beneath the drill holes in the door were turned over to the police laboratory and there compared with a chip of wood discovered in a crevice on the trailing edge of the brace and bit found in the car driven by Miller, and also compared with sample chips of wood produced by using the brace and bit on similar wood. Paint on the chip taken from the brace and bit was of the same color and tex-

ture as that found at the Wolfsen laboratory, and it was the opinion of the police chemist that this paint had been made by the same manufacturer. Comparing the markings made by the cutting edge of the brace and bit on a sample chip of wood with the markings on one of the chips of wood found at the Wolfsen laboratory caused the police expert to conclude that the same tool made both chips.

Both Miller and Carnes took the stand in their own behalf. Their versions of the events on the night of July 18th were sharply conflicting. According to appellant's version, he went to Carnes' place of residence some time after 7:45 that evening. He and Carnes had a beer and watched television for about an hour and Carnes then suggested that they have a drink, stating that he had some tools he wanted to drop off at his shop. Carnes "threw" some tools into appellant's car on the floor behind the passenger seat and they drove to the place where Carnes worked and parked in his regular place behind the shop because they could not find available parking on the street. As they parked, according to appellant, Carnes produced a gun from his pocket and informed appellant that he thought he would pull a stickup. Appellant objected, saying that he wanted nothing to do with a gun, and that at his suggestion the gun was locked in the glove compartment. Thereafter he and Carnes went to a bar across the street and had a few drinks. They left the bar at approximately 11 o'clock and returned to the car. Carnes took the tools from the car and told appellant to wait a minute, that he was going to drop them off at his shop. Carnes went around a corner of the building and appellant remained in his car. When Carnes did not return for quite some time, appellant went to look for him. Rounding the corner of the building, appellant noticed an open door and through the door he saw a light moving around in the front of the building. Appellant then called out to Carnes, who came running back and told him to be quiet and stay where he was. Thereafter, Carnes returned to the car carrying a radio and some other "stuff" in his arms and told appellant to "take off." As they drove away, appellant asked Carnes where he got the radio. Carnes replied that appellant had better "shut up" or he would involve him. Appellant then drove to Beverly Hills, intending, according to his testimony, to see some friends and ask their assistance in getting out of his predicament. He was arrested, however, prior to reaching his destination.

Carnes testified that shortly after 8 o'clock that evening

Miller arrived at his house and asked him to return to his (Miller's) apartment to fix a refrigerator that was leaking gas. In compliance with Miller's request, Carnes picked up his flashlight and accompanied Miller to his home. After an unsuccessful attempt to fix the refrigerator Miller drove Carnes back to the latter's house, arriving there at approximately 9 o'clock. Miller told him that he might see him later and then drove off. Miller returned to Carnes' house, according to the latter's testimony, shortly after 10 o'clock. They shared a beer; whereupon Miller invited Carnes to take a ride out to Beverly Hills where he was going to pick up a friend. They left Carnes' house at approximately 10:20 in Miller's car headed for Beverly Hills. As they proceeded down an alley in Beverly Hills Carnes looked to the rear and saw what appeared to be a police car with a blinking red light. He told Miller they had better stop. The latter replied, "If they say anything to you, I was with you all night." After they had been stopped and arrested Carnes told the officers the story about being with Miller in a bar and finding the equipment in the car only because of Miller's request and because of their friendship, he wanted to help him.

Appellant's first contention is that the evidence against him was obtained as the result of an illegal arrest and an unlawful search and seizure and that the evidence thus obtained should have been excluded.

Penal Code, section 836, as amended in 1957, provides in part as follows: "A peace-officer may . . . without a warrant, arrest a person: . . . 3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed."

■ Reasonable cause is shown when a man of ordinary care and prudence, knowing what the officer knows, would be led to believe or conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Kilvington,* 104 Cal. 86, 92 [37 P. 799, 43 Am.St.Rep. 73]; *Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250]; *People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967].) Reasonable cause may exist even though there may be some room for doubt. (*People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344].)

■ While patrolling at approximately 11:30 p. m., in a plainly marked police vehicle, the officers were being approached from the opposite direction by a car driven by appellant. He and his passenger, Carnes, appeared to be looking at the police vehicle and immediately appellant turned his

car to the left, into an alley through which they proceeded to the next street where they were stopped by the officers for questioning. Because of the lateness of the hour and the suspicious action of the appellant in turning into an alley immediately after seeing the police car, the officers were justified in stopping appellant for further investigation. ■ After questioning him about his destination and the ownership of the car, Officer Bolander, while "standing alongside their vehicle . . . looked into it and . . . observed . . . numerous tools, and a radio and gloves, and a flashlight." These tools and articles could fairly be described as burglar's tools. The officer's action, in shining his flashlight inside the car while remaining outside, did not amount to an illegal search and when he observed various articles which could be described as burglar's tools inside the car he had "reasonable cause" for placing appellant under arrest for "suspicion of burglary." Making these observations through a window of a car does not constitute an unreasonable search and seizure and the officers were entitled to act upon the information thus obtained. (*People v. Moore,* 140 Cal.App.2d 870, 871 [295 P.2d 969]; *People v. Martin,* 45 Cal.2d 755, 762 [290 P.2d 855]; *People v. Hen Chin,* 145 Cal.App.2d 583, 586 [303 P.2d 18].) In *People v. Brooks,* 154 Cal.App.2d 631 [316 P.2d 435], the officer had stopped an automobile for a traffic violation and from the outside he saw cases of whiskey, similar to those that had been stolen, on the back seat. Thus, said this court, there was no unlawful search (p. 635).

■ As an incident to the arrest of defendants, it was proper to make a further search of the car, as a result of which the radio and green stamps that had been taken from the Wolfsen laboratory were found. It, therefore, follows that the evidence was admissible. (*People v. Coleman,* 134 Cal. App.2d 594, 599 [286 P.2d 582]; *In re Dixon,* 41 Cal.2d 756, 761-762 [264 P.2d 513]; *Harris v. United States,* 331 U.S. 145, 151 [67 S.Ct. 1098, 91 L.Ed. 1399].)

■ Appellant challenges the reliability of the testimony of several witnesses and seeks to bolster his own. In effect, he would have this court reweigh the testimony and reevaluate the credibility of the witnesses. Under established principles of appellate review, this is the prerogative of the trial court.

Appellant contends that the trial court committed reversible error in instructing the jury on the subject of accomplice testimony. The instructions given on this subject, to which appellant objects, were CALJIC Number 821, relating to

the necessity of corroboration of accomplice testimony and the definition of an accomplice, Number 829, stating that the testimony of an accomplice should be viewed with distrust, and Number 822, stating what constitutes sufficient corroboration. The first two were given at the request of defendant Carnes; the last on the court's own motion. In this connection appellant points out that neither he nor Carnes testified for the prosecution, but that each testified only in his individual defense. Appellant then argues that the giving of these instructions had the effect of labeling him an accomplice thus causing the jury to view his testimony in his own behalf with distrust. Relying on *People* v. *Arends,* 155 Cal.App.2d 496 [318 P.2d 532], and *People* v. *Dupree,* 156 Cal.App.2d 60 [319 P.2d 39], appellant makes a persuasive argument from his point of view. However, assuming it was error to give these instructions, did such error result in a "miscarriage of justice"? In *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243], the court stated (p. 836) : ". . . a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

Applying this test to the record before us, we are of the opinion that it is not reasonably probable that a result more favorable to defendant would have been reached if the challenged instructions had not been given. Appellant was arrested shortly after the Wolfsen laboratory burglary driving his own car in which were found a radio and green stamps that had been taken from the laboratory. A brace and bit found in his car was identified by expert testimony as being the one used to drill the holes in the back door of the laboratory. Appellant's explanation to the officers that the tools in the back seat of his car were used by him as a typewriter repairman was less than convincing. After his arrest appellant made conflicting statements about the articles found in his car. He at first claimed ownership of the radio and tools but denied any knowledge of the green stamps. Later, at the police station, he stated that he knew nothing about the articles in his car other than that he found them there after his return from a bar in the vicinity of the Wolfsen laboratory. In still a later statement he admitted that he and Carnes had drilled some holes in the rear door of the laboratory and

that they had entered and taken the radio and green stamps. In the light of this factual picture we are unable to see a miscarriage of justice in this case.

Appellant's final complaint is that in giving an instruction on the defense of "alibi" the trial court erroneously indicated that both he and Carnes had introduced evidence tending to prove that they were not present at the time and place of the crime. Although Carnes gave such testimony, appellant did not. Appellant's testimony was to the effect that he was at the scene of the crime, having gone to look for Carnes and discovered him in the burglarized building instead of dropping off his tools, as he said he was going to when he took them out of the car at his shop, which was near the laboratory. Appellant argues that the effect of this instruction was to lead the jury to conclude that if they had no reasonable doubt that he (appellant) was present at the scene of the crime, then he should be convicted. Such a result is highly improbable since it would be contrary to other instructions defining burglary as including the element of criminal intent and requiring proof of guilt beyond a reasonable doubt. We see no basis for prejudice in this situation.

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied October 5, 1959, and appellant's petition for a hearing by the Supreme Court was denied November 3, 1959.