[Crim. No. 4305. First Dist., Div. One. Dec. 17, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. TOMMIE SMITH, Defendant and Appellant.

Lester W. Blodgett, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Barry L. Bunshoft, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, P. J.—Defendant appeals from judgment of conviction after jury trial of violation of section 211, Penal Code (robbery with prior convictions).

### QUESTIONS PRESENTED

1. Was defendant deprived of due process by the discharge of his attorney during the trial and the refusal of the court to appoint another attorney?

2. Insufficiency of evidence.

3. Was there an unlawful search and seizure?

4. Was the action of the district attorney in asking defendant concerning his 1945 conviction of grand theft and in referring to it in argument, improper?

5. Were posed photographs of the getaway car at the scene of the crime admissible?

RECORD

Defendant was charged in an information with the crime of robbery, with prior convictions. He admitted four prior convictions: (1) grand theft; (2) armed robbery in the first degree; (3) robbery; (4) assault with a deadly weapon. The jury found defendant guilty of robbery.

About 8 p.m. on May 14, 1962, Mrs. Christiansen, a resident of the area next to the parking lot between the El Nido Market and Amario's Store in Richmond, saw a car parked in the driveway leading to the parking lot. It was a Pontiac station wagon, dark green, with simulated wood paneling along its sides. A portion of its chrome was broken off the front fender at the door. A Negro, occupying the car, was pointing toward the store and talking with another Negro who was standing outside the car. The latter was short, rather plump, and had on a hat with a "floppy brim." The man outside the car walked away. The other drove the car out of sight down Sacramento Street. Two or three minutes later the car reappeared, driving down Panama Street. It stopped and then backed into the parking lot. A Negro was still behind the wheel. Mrs. Christiansen called her son to the window. While watching the car, they saw a rather short Negro come running between the market and the drug store. As he did that, the car pulled out from where it was parked, the short man jumped into it, and the car pulled away. The son thought that the license number of the car began with AWA. The light in the parking lot showed the green color of the car. A third witness corroborated the testimony as to the actions of the car as it backed into the parking lot.

About 8:20 p.m. Officer Simmons of the Albany Police Department heard a radio broadcast from the El Cerrito Police Department, concerning an armed robbery which had just taken place at the El Nido Market. The description of the vehicle was broadcast, a '49 or '50 dark green station wagon, imitation wood paneling, possibly a Pontiac. Officer Simmons also received a description of a possible suspect, "a colored male." Officer Simmons proceeded in his patrol car to high-

way 40 nearby. A vehicle came up behind him that appeared to match the radio description. The vehicle seemed reluctant to pass. Simmons kept at a slow pace in the right hand lane in order to force the car to do so. When it finally passed, it fitted the description of the getaway car. In it were two Negro males. Simmons and a passing highway patrolman stopped the car and the two occupants got out. Defendant, to whom the car was registered, was the driver. The passenger was Joseph Jackson.

The victim of the robbery, Robert Horton, was brought to the scene and identified Jackson as the person who robbed him at the market.[1] Horton was closing out the cash registers there for the night. While Horton was at a cash register Jackson entered the market, walked around for a short while, came up to Horton, pointed a gun at him and demanded all the money in the cash register. When he had taken all the money, Jackson ordered Horton and several customers to go into a back room. He then ran out of the market.

After Horton identified Jackson at the car, Jackson was taken into custody and searched. His pockets were stuffed with money in small denominations. At the trial, Jackson, called as a witness by defendant, admitted that he was the one who held up the market that night, but claimed that defendant had no part in the affair; that defendant had picked him up on the highway a few minutes before the officer stopped the car. He denied that defendant knew that he was armed, and testified that while he had seen defendant before at Folsom, he did not realize this until they were both in the police station. Jackson admitted three prior felony convictions.

The day after the robbery, Mrs. Christiansen identified defendant's car as the same one she had seen in the parking lot. Its license was AWA-180.

Defendant testified at the trial, admitting that the car was his. He stated that between 8 and 8:30 p.m. he was driving on highway 40 where he picked up Jackson as a hitchhiker. Three or four minutes thereafter he was stopped by the officers, who informed him that his car fitted the description of the getaway car used in a robbery. He denied being at the scene of the crime or knowing anything about it.

The People called witnesses who testified that Jackson and defendant had been on the same work detail at Folsom in

---

[1]Horton subsequently identified Jackson in a lineup, and then again in court.

1961, and had lived in the same barracks type dormitory. In 1956 they were in the same cell block. Jackson, the morning after the robbery, stated that he had met defendant on Seventh Street in Oakland on the evening of the robbery; that they drove past the El Nido Market several times; that after committing the robbery, he got back into defendant's car and that he intended to split the proceeds with defendant.

## 1. DISCHARGE OF DEFENDANT'S ATTORNEY.

Defendant contends that he did not intelligently waive his right to counsel and that the trial court did not make the required examination into defendant's capacity to conduct his defense; hence that the court abused its discretion in refusing to appoint a substitute attorney.

The court had appointed an attorney to represent defendant at the trial. The record shows that on the first day of the trial the attorney conducted defendant's defense in such a manner as to justify the court's statement, after defendant had requested the attorney's discharge, that the attorney ''was very zealous in his defense of the defendant up to this time and he is to be commended for the services rendered up to this time.''

On the opening of court on the second day, and at the end of the prosecution's case in chief, the attorney, outside the presence of the jury, stated that his client desired to make a motion, the contents of which defendant refused to disclose to him. Defendant then asked for a ''venue'' of the case, which he explained meant he wanted to ''discontinue'' it, because he felt that the judge was prejudiced against him. This contention, he explained, was based upon the fact that on *voir dire* the judge, while instructing the jury that the members must not talk to anyone about the case, stated that if they did he would have to declare a mistrial, and that as a consequence a new trial would have to be had which would constitute a large and unnecessary expense to the county's taxpayers. Defendant contended that this, in effect, told the jury that if the jury did not find defendant guilty, the trial would be a waste of the taxpayers' money. The court denied this motion, explaining that its statement applied only to a situation where a juror might discuss the case in violation of instructions. The motion was properly denied, as the judge's statements to the jury do not bear the construction placed upon them by the defendant.

Thereupon, defendant stated that he wanted his attorney dismissed because defendant felt that he had been misrepresented by the attorney. The court then explained that if the attorney were discharged defendant would have to proceed in his own behalf. Defendant then stated that he did not have the ability to try the case himself and wanted another attorney, and again that he wanted the case "discontinued." The court then suggested that the attorney continue in the case. Defendant said that he did not want him. The court then stated that defendant would have to proceed in his own behalf. The attorney stated "defendant has made it rather difficult for me to communicate with him about the defense in this case. And so I do feel that there is a complete lack of communication in regard to his defense, and a complete lack of understanding between ourselves. And I do feel that he's probably not qualified to continue with his own defense, but because of our problems between ourselves, I feel I cannot continue." The court stated, as did the district attorney, that the services rendered by the attorney were commendable. Thereupon the court ordered that the trial resume with defendant acting for himself. The court then instructed the attorney to remain within the counsel rail, to advise defendant if he desired it. Defendant then informed the court that he did not desire the attorney to remain in the courtroom.

▆ It is clear as a matter of both state and federal law that an indigent defendant has the constitutional right to be provided with counsel. (*Gideon* v. *Wainright* (1963) 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799]; *People* v. *Chesser* (1947) 29 Cal.2d 815 [178 P.2d 761, 170 A.L.R. 246].) But a defendant may waive that right and make his own defense. (*Carter* v. *Illinois* (1946) 329 U.S. 173 [67 S.Ct. 216, 91 L.Ed. 172]; *In re Connor* (1940) 16 Cal.2d 701 [108 P.2d 10].) ▆ If a defendant elects to waive his right to counsel, he must do so intelligently and with understanding. (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [58 S.Ct. 1019, 82 L.Ed. 1461, 1466, 146 A.L.R. 357]; *People* v. *Chesser, supra.*) The burden is on the defendant, however, to show "by a preponderance of the evidence, that he did not have counsel and did not competently and intelligently waive his constitutional right to the assistance of counsel." (*Moore* v. *Michigan* (1957) 355 U.S. 155, 161 [78 S.Ct. 191, 2 L.Ed.2d 167, 172]; *Johnson* v. *Zerbst, supra; People* v. *Sherman* (1962) 211 Cal.App.2d 419, 428 [27 Cal.Rptr. 353].) ▆ "The determination of whether there has been an intelligent waiver of counsel in-

volves a consideration of the nature of the charge, the facts and circumstances of the case, and the education, experience, mental competence and conduct of the accused." (*People* v. *Chesser, supra,* at p. 822; accord: *Johnson* v. *Zerbst, supra.*) "The constitutional right of an accused to be represented by Counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake —is without Counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." (*Johnson* v. *Zerbst, supra,* at p. 465 [82 L.Ed. at p. 1467].) The court continues that "whether there is a proper waiver should be clearly determined by the trial court ..." (p. 465 [82 L.Ed. at p. 1467]). (Accord: *People* v. *Butcher* (1959) 174 Cal.App.2d 722 [345 P.2d 127].) But "The trial judge ... has no duty to give defendant a legal education, and the judge has no right, in view of the privilege against self-incrimination, to ask defendant about his understanding of the facts of the case." (*People* v. *Mattson* (1959) 51 Cal.2d 777, 794 [336 P.2d 937].)

Strictly speaking, the issue is not a waiver of assistance of counsel except in the sense that defendant, after a day's representation of him by counsel was given a choice of either proceeding with the counsel chosen for him or proceeding on his own behalf. The real question is whether under the circumstances of this case, the court should have appointed another attorney to represent defendant. It must be remembered that defendant was no stranger to court procedure, theretofore having been convicted of four different crimes, three of which were felonies.

In *People* v. *Mattson, supra,* 51 Cal.2d 777, the court said at page 789: "... the California courts, in determining the extent of the right to counsel under state law, consider such matters as the intricacy of the accusatory pleading, the complexity of the law as to the offense charged and included offenses, defendant's intelligence, education, experience (*including familiarity with the criminal law derived from prior prosecutions*), youth, mental and physical health and emotional condition, the attitude of the court and the prosecuting officials and the existence of inflamed public opinion, and also the severity of the penalty." (Italics added.)

The trial judge, in determining the issue, must have taken into consideration the manner in which the attorney conducted the defense all during the prosecution's case in chief.

He characterized the attorney's services as "very zealous" in defendant's defense. The court could very well have concluded under the circumstances that defendant's request for another attorney was primarily an attempt to get a "discontinuance" of the trial after he had heard the prosecution's evidence, which clearly showed his guilt.

We have reviewed the record. Applicable here is the following language from *People* v. *Lugo* (1963) 220 Cal.App. 2d 54, 59 [33 Cal.Rptr. 572]: "Our review of the record indicates that the defendant was ably and adequately represented" by the attorney prior to his discharge.

Defendant had the benefit of an active counsel throughout the presentation of the prosecution's case in chief. Thereafter, he called in his defense codefendant Jackson, who testified in effect that Smith had no knowledge of the crime nor was a participant in it. The trial judge participated in eliciting testimony from Jackson and helped Smith conduct his examination. There is nothing in the record to show that defendant was unduly handicapped by the absence of counsel. He had on a previous occasion been convicted of armed robbery, and had three other convictions. "Through these experiences he had gained some familiarity with criminal court procedure." (*People* v. *Sherman, supra,* 211 Cal.App. 2d 419, 428.) This was indicated by his motion for "venue," calling his own witness and properly examining him, and his knowledge of the degrees of robbery evidenced in his closing argument.

After the impeachment of Jackson, defendant was asked if he wanted any redirect. He responded, "No, I'm perfectly satisfied, Your Honor." There were no other witnesses to be presented. Defendant said that he wanted to take the stand because "It may be that the Prosecuting Attorney would have something that he would wish to ask me concerning this case. . . ." The court advised defendant that he did not have to take the stand. There was nothing improper in the cross-examination of defendant. Defendant did not seek to cross-examine the rebuttal witness called to establish his past association with Jackson. Much of that evidence was documentary, consisting mainly of prison records of time the two had been in the same dormitory in prison, had served in the same work gang and been in the same cell block.

*People* v. *Linden* (1959) 52 Cal.2d 1 [338 P.2d 397] (cert. den. 364 U.S. 849 [81 S.Ct. 94, 5 L.Ed.2d 73]), is closely in point. The defendant in that case was on trial for the killing

of a police officer. Court-appointed counsel represented the defendant until the fifth day of the trial. The defendant thereupon, out of the presence of the jury, told the court that counsel "did not want to go on with the case the way I wish." The defendant then asked that his counsel be discharged and another one appointed. The trial court refused, and the refusal was upheld by the Supreme Court. On appeal, counsel argued to the court that the trial court did not determine that the defendant understood the issues and the available defenses and had capacity to effectively waive counsel. In that case, too, the defendant told the court that he was not capable on his own. The court said (pp. 17-18): "Long before trial defendant was afforded the advice and accepted the representation of his trial counsel, and after defendant was allowed to undertake his own representation he still had the advisory services of counsel. Trial counsel's statement ... that he was willing to try the case without direction from anyone who did not 'understand what is going on,' did not indicate his opinion that defendant was altogether devoid of understanding ...

"Before the trial court allowed defendant to represent himself, it held lengthy discussions with him and had ample opportunity to observe his abilities and disabilities ... [T]he court was not required to demand that defendant, as a prerequisite to appearing in person, demonstrate either the acumen or the learning of a skilled lawyer."

See also *People* v. *Glancy* (1963) 213 Cal.App.2d 629 [28 Cal.Rptr. 903]. In that case the court said at page 633: "When a defendant discharges his attorney without cause, he is ordinarily deemed to have waived his right to counsel and he is not entitled to demand, at a later stage of the proceeding, that the court appoint a substitute." The court there warned the defendant that if he dismissed the public defender he would have to proceed to represent himself unless he obtained counsel privately. Trial was held at which the defendant again refused the services of the public defender. The court declined to appoint another counsel. The defendant thereafter pleaded guilty. His conviction was affirmed.

The trial court has some discretion as to whether counsel is required. " 'To hold that a defendant charged with a crime has an absolute right to counsel of his own selection, with unlimited right to insist upon continuances of his trial, would be subversive of the prompt administration and execu-

tion of the laws. . . . It is at once apparent that the trial court must in the nature of things have some control over such matters. . . .' '' (*People* v. *Thomas* (1962) 58 Cal.2d 121, 131 [23 Cal.Rptr. 161, 373 P.2d 97]).

 ''It is well settled that where the attorney for the accused is appointed by the court, the attorney selected by the court in the exercise of a sound legal discretion must be accepted by the accused in the absence of some compelling reason to the contrary.'' (*People* v. *Ortiz* (1961) 195 Cal. App.2d 112, 116 [15 Cal.Rptr. 398]; see *People* v. *Wade* (1963) 215 Cal.App.2d 49, 53 [29 Cal.Rptr. 822].)

Although apparently defendant had made it difficult for his attorney to communicate with him, defendant had made no objection to the trial commencing with the attorney representing him, and only objected after he was confronted with the evidence against him. He then wanted the trial ''discontinued.''

 ''[I]t is the duty of the court to safeguard and promote the orderly and expeditious conduct of its business and to guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper or delay the conduct and dispatch of its proceedings.'' (*People* v. *Mattson, supra,* 51 Cal.2d at p. 792.)

Defendant does not allege any incompetence of his court-appointed counsel. Nor does he allege any reason for his dismissal of counsel except ''I have been misrepresented by him from the first beginning.'' The trial judge called the district attorney and defendant into chambers for consultation as to the proposed instruction of the jury. Thereafter, defendant changed his mind not to present any witnesses and decided to call Jackson as a witness. Evidently, the judge suggested that he present some defense. Throughout the presentation of the defense, the court was solicitous of defendant's welfare and aided him in presenting his case. Even though there was no formal examination of the defendant by the judge as to his capacity to conduct his defense, the judge had observed the defendant during the trial, had talked with him in chambers, and helped him conduct his defense. There is no evidence at all of defendant's lack of mental capacity, experience or his ignorance from which can be inferred prejudice of his constitutional rights. Absent some showing that court appointed counsel was in bad faith, incompetent, or prejudiced against defendant's cause, and in view of his vigorous defense as indicated by the record, the trial court was not

required to supply a lawyer who would conduct the defense as he, the defendant, thought it should be conducted.

## 2. INSUFFICIENCY OF EVIDENCE.

██ Defendant's contention that the evidence is insufficient lacks conviction. It seems based upon the proposition that "The evidence put forward by the District Attorney was contradicted by the testimony of Appellant and Mr. Jackson." Three witnesses observed defendant's car parked in the parking lot in front of the store. Two witnesses observed that the driver was a tall male Negro, while outside there was a shorter one. Defendant and Jackson fitted the descriptions given. The actions of the two could very well be interpreted as "casing" the store. Three witnesses testified that the driver of the car backed into the parking lot from another entrance. Moments later, two witnesses saw a short Negro run from the store and leap into the car and drive away. About half an hour later that same car, registered to the defendant, was stopped by police pursuant to a radio alert. Inside was Jackson who admitted the robbery. Next to the car was a loaded gun. Defendant admits that it was his car, and witnesses who saw the car in the parking lot identified it as the one stopped by police later. Though Jackson denied that defendant had anything to do with the robbery, the evidence shows that the jury could well have disbelieved him, particularly considering the acquaintanceship between defendant and Jackson at Folsom, and defendant's denial that he or his car had ever been in the parking lot, and the attempt made to make it appear that the relationship between defendant and Jackson was but a casual one. The evidence was more than ample to demonstrate defendant's guilt.

## 3. NO UNLAWFUL SEARCH AND SEIZURE.

██ Defendant's counsel at the trial moved to strike the testimony of Officer Simmons and any other testimony pertaining to defendant's automobile "because of the fact that there was no probable or reasonable cause for that particular vehicle to be stopped at that time and, therefore, whatever occurred after that was an unreasonable search and seizure." Defendant does not point out in what respect the stopping of defendant's car by Officer Simmons after receiving the radio broadcast concerning the robbery and testimony pertaining to the car could constitute an illegal search and seizure. The stopping of the car under the circumstances was eminently proper, and the arrest of its occupants after Jack-

son was identified by Horton was likewise proper. Not only did the car stopped by the officers answer the broadcast description of the getaway car but it appeared that on approaching the officer's car, defendant's car appeared "not [to] want to pass."

As to the testimony, no objection was made to it at the time it was advanced. Jackson was identified by an eyewitness to the robbery as the one responsible. A loaded gun was discovered in the vicinity. It is clear that the officer had reasonable cause to believe that a felony had been committed by the occupants of the car, and, therefore, stopping the car and incident search were not unlawful. (*People* v. *King* (1962) 199 Cal.App.2d 333, 339 [18 Cal.Rptr. 624]; *People* v. *Lewis* (1960) 186 Cal.App.2d 585, 601-602 [9 Cal.Rptr. 263]; *People* v. *Borbon* (1956) 146 Cal.App.2d 315 [303 P.2d 560]; see also *People* v. *Cartier* (1959) 170 Cal.App.2d 613 [339 P.2d 172]; *People* v. *Romero* (1957) 156 Cal.App.2d 48 [318 P.2d 835].) "Reasonable cause is shown when a man of ordinary care and prudence, knowing what the officer knows, would be led to believe or conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Carnes* (1959) 173 Cal.App.2d 559, 565 [343 P.2d 626].) "Reasonable cause may exist even though there may be some room for doubt." (*People* v. *Carnes, supra,* p. 565; see also *People* v. *Vaughn* (1957) 155 Cal.App.2d 596 [318 P.2d 148].)

4. 1945 CONVICTION.

■ On cross-examination the district attorney asked defendant in impeachment if he was not convicted in Alameda County of grand theft. Defendant replied that he was. In argument the district attorney referred to this conviction by saying that defendant had been "once convicted of grand theft" as, with the other convictions, impeaching defendant. No objection was made to either, nor was there any assignment of misconduct at the trial. Defendant may not raise any question on the subject for the first time on appeal, as, under the circumstances of this case, the action of the district attorney was not of such a character that a harmful result could not have been obviated or cured by instruction of the court. (See *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136].)

■ Defendant contends that this grand theft conviction was a misdemeanor. The record fails to show what the punishment was. In the information charging defendant's priors, it is stated that in 1945 defendant was convicted of grand theft

and that in pursuance of this conviction defendant served a term in the Alameda County Jail and was given two years' probation.

Under section 17, Penal Code, the crime would be a misdemeanor and not a felony, and hence not admissible in impeachment. (See *People* v. *Hamilton* (1948) 33 Cal.2d 45 [198 P.2d 873].) ▆▆▆ While commenting upon a defendant's prior felony convictions as cognizable in impeachment of the defendant's testimony is proper (see *People* v. *Beverly* (1962) 200 Cal.App.2d 119, 124 [19 Cal.Rptr. 67]) it is not proper to comment on a prior misdemeanor conviction. However, in view of defendant's record which was admissible and to which reference could properly be made, the error was not prejudicial. It is inconceivable that had the jury not heard of this conviction it would not have found him guilty.

This case differs from *Hamilton, supra,* where the court held that admitting evidence of a prior misdemeanor conviction together with failure to give the admonitory instruction concerning the testimony of an accomplice constituted reversible error in that there the only prior conviction of the defendant was the inadmissible misdemeanor conviction concerning which the court said (p. 51): "Also, the record of Bundy's prior conviction, erroneously presented to the jury, unquestionably had much effect," whereas in our case there were three other prior convictions, all felonies, and all admissible, and as we have hereinbefore stated, the addition of one more conviction could not possibly have affected the verdict.

5. PHOTOGRAPHS ADMISSIBLE.

▆▆▆ It is clear from the record that the pictures complained of as prejudicial by the defendant were introduced for the purpose of showing that two of the complaining witnesses could in fact have seen and identified the defendant's automobile from the window as they testified they did. No objection was taken to their introduction. The prosecution asked the witnesses if the pictures constituted "the view that you saw from your window that night." The witnesses responded that it was. It was thereby established that although taken at a date subsequent to the robbery, the pictures represented an accurate reproduction of the scene as it appeared to the witnesses at the time of the crime. No prejudice appears where a witness uses a photograph as a "chalk" to better explain that to which he is testifying. There was no error in the introduction of the photographs. (See Witkin,

Cal. Evidence, § 314, pp. 352-354; cf. *Greeneich* v. *Southern Pacific Co.* (1961) 189 Cal.App.2d 100 [11 Cal.Rptr. 235].)

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 5, 1964.