[Crim. No. 12422.   Second Dist., Div. One.   Aug. 31, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LEROY HUTCHINSON, Defendant and Appellant.

John P. Bruno, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of murder in the first degree and of robbery in the first degree.

In an information filed in Los Angeles on November 30, 1965, defendants Hutchinson and a George Eugene Young were charged in count I with murdering Haw Dai Yee on October 23, 1965, and in count II with robbing May Fong Yee on October 23, 1965, of about $35. It was first alleged that, at the commission of the robbery, the defendants were armed with a deadly weapon, a revolver. Defendants pleaded not guilty and in a jury trial each was found guilty of murder in the first degree. In the penalty trial the jury found for life imprisonment; each of the defendants also was found guilty of robbery in the first degree and it was found further that Young was armed at the time of the commission of the offense and that Hutchinson was not armed at the time of the commission of the offense. Hutchinson was sentenced to the state prison, the sentences as to counts I and II to run concurrently with each other. A notice of appeal was filed by Hutchinson.

A résumé of some of the facts is as follows: Fong Mee Yuk Yee and her husband, Haw Dai Yee, operated a small grocery store at the corner of Santa Barbara Avenue and McKinley Street in Los Angeles. About 6:50 p.m. on October 23, 1965, Mrs. Yee was working at the counter in the store waiting on customers. At about that time, Young and Hutchinson came

into the store together. Hutchinson went to the bread shelves and Young went to the candy counter where Mrs. Yee was working. While Young talked with Mr. Yee about buying some gum, Mrs. Yee went to the kitchen in the rear of the store to prepare an evening meal. While Mrs. Yee was in the kitchen, Young came into that room, pointed a gun at Mrs. Yee's back, and motioned her into the store. She went to the meat counter. Neither Hutchinson nor Mr. Yee was in sight in the store at this time. Young, noticing that Mr. Yee had gone outside of the store, moved forward toward the front door of the store, went outside and fired two shots from a revolver. Mrs. Yee saw Young as he fired the shots but from her location she could not see her husband.

Mrs. Yee went back into the kitchen area and saw Young return to the store, take $35 from the cash register, put it in his pocket and then leave. Mrs. Yee noticed that Young was wearing a gray checkered suit. After Young left, Mrs. Yee went to the front of the store to look for Mr. Yee. She saw Hutchinson driving a cream, milky-colored automobile away from the curb, after having seen Young get into the vehicle. Mrs. Yee went outside and saw Mr. Yee on the sidewalk. He said, "I'm very painful. They shot me for two fire. . . . I got two fire of gun."

In a few minutes the police and an ambulance arrived. Wiley Conley was visiting friends at a house one block from the grocery store. He was sitting on the front porch and heard the two shots coming from the area of the grocery store. He went to the store area and saw a crowd gather and mingle around the body of Mr. Yee. Conley started back to the house to seek assistance and noticed two persons walking from the store to a car parked nearby. He was standing about 6 feet from the car and made a mental note of the license number of the rear plate. He thought the car was a yellow and black 1949 to 1954 Chevrolet and that the license number was OEX 682. The car was driven away in a northerly direction on McKinley Street. The car Conley saw resembled a picture of Young's car. Conley went inside the house and wrote down what he thought was the license number on a piece of paper. Conley returned to the scene of the shooting and told an officer of his taking down the license number of a car. The officer went to the house where Conley was visiting and took the paper with the supposed license number thereon. The police broadcast a description of the car and the license

number. The police first, however, checked out the license number with the Department of Motor Vehicles and ascertained that the letters and numbers Conley furnished were not registered to a Chevrolet.

At about 11 a.m. in an area about a mile from the robbery and murder, Sergeant Stone, of the Los Angeles Police Department, who earlier had heard a broadcast describing the color and license number of the automobile in connection with the murder and robbery, saw a 1951 Chevrolet, black over yellow with license number QEX 862, pulling into the curb preparatory to stopping. Stone radioed for police assistance, put on the police car lights and as Young started to get out of the car said, "Stop. I want to talk to you." Young got out from the passenger side. Other officers drove up immediately and they took over. Hutchinson and Young were separated to the end that they could not converse with each other. The officers saw in plain sight on the back seat of the car a shoulder holster for a firearm and on the front seat a black jacket. The officers had, through the broadcast and otherwise, a description of the suspects involved in the murder-robbery (but apparently not a description of their wearing apparel). The car had been described and the information was that male Negroes had been seen leaving the store and getting into that particular type of car. Furthermore, one of the officers at the arrest scene had talked with the victim's surviving wife, Mrs. Yee, through her son. The defendants Hutchinson and Young were arrested for robbery. A search of the car was conducted. In the pocket of the jacket on the front seat there were ten .32 caliber bullets. Another .32 shell was found under the back seat. There was no significant conversation with Hutchinson at the arrest and search scene. Hutchinson was taken to Newton Station where he was fully advised of his constitutional rights and where Hutchinson stated that he understood his rights. At about 1:30 p.m. on October 25, 1965, Sergeant Weld, with Officer Burlson, talked with Hutchinson at the central jail. Hutchinson again was advised of his constitutional rights as delineated by the *Dorado* and *Escobedo* cases and Hutchinson again stated that he understood his rights. Hutchinson talked freely and voluntarily about the robbery and killing at the grocery store. Sergeant Weld made notes of the conversation and the statements by Hutchinson. Hutchinson read the writing of Sergeant Weld and told the officer that it contained the gist of what had been said. Hutchinson

signed the statement[1] as did Sergeant Weld and Officer Burlson. One of the officers spoke to Hutchinson about a discrepancy, that the previous day Hutchinson had stated to Sergeant Weld that there was only one gun and that he (Hutchinson) did not have a gun during the robbery. Sergeant Weld asked Hutchinson which was correct and Hutchinson said, "You put it down like I told you."

The officers under similar circumstances took a statement from Young.[2]

The statement of Hutchinson was introduced into evidence without objection. The Young statement was received into evidence over objection and the jury was thoroughly admonished that Young's statement was to be used against Young only and not against Hutchinson. The defendants were asked how

---

[1] "I have been advised of my rights, to remain silent, to have an attorney present at all proceedings, & anything I say may be used against me. I understand my rights.

"I was taking the gun over to show some friends of mine. They had never seen a 7 shot 32 cal. I just recently bought the gun from George. It was a 32 Cal. Revolver Smith & Wesson. The Barrel was about 6" long, Blue Steel with a brown handle. I looked for my friends at 51st & Ascot aprox 6:00 but they were not around, George and I were driving past the Market. I told George I needed some money & he said he did to [sic]. I said that Market looks easy but George didn't want to hit it. I coned him into it. We parked the car down the street & walked back to the market. We both went into the store. I ordered some doublemint gum. I pulled out the gun from the waistband of my pants. I was waring [sic] a black jacket. I told the man give me your money. The man (Vict.) ran out of the store and ladie [sic] ran to the back of the store. George ran out of the store after the man & told him (Vict.) to come back into the store. The man was yelling real loud. I think he said stop leave me alone. I ran outside & told George to get the money. I told the man to get back inside. The gun was pointed a little to his right. He looked at me & then the gun. He grabbed the gun & pulled it toward himself & it went off. He fell down & said that he had been shot. George had got the money & came out. We started runing [sic] down the street. I dropped the gun & it went off again. I picked it up and we ran to the car. There was only 2 shells in the gun. We drove n/b on McKinley to Jefferson. We went L/B on Jefferson to Griffith W/B on Griffith to 33rd St. We went left on 33rd St. & when we passed San Pedro there was a white garage. George threw the gun out there. He threw it past me out my side. I didn't hear it hit & thought it landed on the lawn.
"D. B. Weld 4268
"Leroy C. Hutchinson
"G. B. Burelson [sic] #5588

[2] "I have been advised of my rights, to remain silent, to have an attorney present at all stages of the proceedings, & anything I say may be used against me in further court proceedings. I understand my rights.

"We were driving down the Street, & LeRoy said he needed some money. I used to live near the Market on 40th Pl. 3 yrs ago. We went around the block because there were some kids in the Store. We parked down the street. We both walked back to the market. We entered the Market & I walked back to the Beer box & LeRoy walked up to the counter. LeRoy was going to ask for some Life Savers. The man ran out of [the] Store & LeRoy followed him out to get him back inside. I had

much was taken in the robbery and Hutchinson indicated it was in the amount of about $52 to $55.

No gun was ever recovered. Both Hutchinson and Young stated that they had thrown a gun out of the car on 33d Street west of San Pedro Street.

The fatal bullet which struck Mr. Yee was a .32 caliber and was recovered from just under the skin on his right side. In an autopsy it was concluded that Mr. Yee died from a gunshot wound in the abdomen perforating the diaphragm and liver with massive hemorrhage. On Mr. Yee's right arm there were imbedded grains of gunpowder indicating that the gun had been fired at a range of less than 3 feet.

Neither Hutchinson nor Young saw fit to testify on the guilt phase of the case.

Appellant now asserts that the evidence is insufficient to support the judgment of conviction of murder in the first degree in the commission of a robbery, that statements of appellant were improperly admitted into evidence and that evidence obtained from an unreasonable search and seizure was improperly admitted. There is no merit to any of appellant's contentions.

We view the evidence as an appellate court. (See *People* v. *Mangiameli*, 149 Cal.App.2d 642, 644-645 [308 P.2d 762] ; *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].)

■ The murder was premeditated and deliberately committed. Young left the store and fired at Mr. Yee who apparently was attempting to secure assistance.

Further, the judgment of first degree murder is supported by the felony-murder rule. Mr. Yee was senselessly killed during a robbery which was the culmination of a conspiracy to commit robbery which occurred as Hutchinson and Young drove around in the car planning the robbery of the store. The acts of both Hutchinson and Young were sufficient to constitute the crimes charged. (See *People* v. *Watson*, 132 Cal.App. 2d 70, 71-73 [281 P.2d 564].)

---

the gun in my hand & had him (vict.) by the left arm. LeRoy had ahold of his right arm. I had the gun up against him. He got away from LeRoy & turned around & that's when the gun went off. I had the gun cocked when I told the victim to come up front please. The gun went off the second time when he (vict.) began to fall. I guess it was my reflexes that fired the second shot. LeRoy went back into the store & got the money. We went back to the car. We drove away & through [*sic*] the gun away where I showed you by that white garage on 33rd St. I didn't intend to shoot the man & I don't know how many bullets were in the gun. I didn't load the gun. I went right out and started drinking, because it shook me up. I called my wife the night I was arrested.''

*People* v. *Ray,* 210 Cal.App.2d 697, 699-701 [26 Cal.Rptr. 825] appropriately states: "The rules governing a case such as this are stated in *People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604], which was also a murder committed in an attempt to rob the victim. ' "Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result. . . . Any joint action on a material point or collocation of independent but conspiring acts by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove cooperation of an individual conspirator." [Citations.]' (P. 215.) 'It is important here to keep in mind the familiar rule that the corroboration required by Penal Code, section 1111 does not include the corpus delicti and is confined to the matter of connection of the individual defendant with the crime. "The only corroboration necessary for the evidence of an accomplice under the statute is that which tends to connect the defendant with the commission of the crime, not evidence of the corpus delicti. [Citations.] The corroborative evidence may be slight and entitled to little consideration when standing alone. [Citation.] Defendant's own admissions are sufficient corroboration. [Citation.] Finally, corroborative evidence may be circumstantial. [Citation.]" [Citation.] These rules are applicable to conspiracy as well as any other crime.' (Pp. 215-216.) ' "Section 1111 of the Penal Code does not require that an accomplice be corroborated as to every fact to which he testified but only that the corroborative evidence tend to connect defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." [Citation.]' (P. 217.) 'The same evidence which connects each of the appellants with the conspiracy and its attempted robbery connects them with the murder. [Citation.] The murder needs no further or other corroboration. [Citation] : "It is, of course, the well-settled law in California that if a human being is killed by any one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the crime of robbery, whether such killing is intentional or unintentional, or accidental, each and all of such persons so jointly engaged in the perpetration of, or attempt to perpetrate such crime of robbery, are guilty

of murder of the first degree." [Citation] : "It is well established, however, that if a homicide is committed by one of several confederates while engaged in perpetrating the crime of robbery in furtherance of a common purpose, the person or persons engaged with him in the perpetration of the robbery but who did not actually do the killing, are as accountable to the law as though their own hands had intentionally fired the fatal shot or given the fatal blow, and such killing is murder of the first degree. The jury has no option but to return a verdict of murder of the first degree whether the killing was intentionally or accidentally done, and it is proper so to instruct the jury." To same effect see *People* v. *Miller*, 37 Cal. 2d 801, 805 [236 P.2d 137]. Proof of defendant's connection with the conspiracy to rob connects him as a matter of law with the attempt to rob and the ensuing murder.' (P. 222.)

". . . .

"*People* v. *Chavez*, 37 Cal.2d 656, 669 [234 P.2d 632] : 'The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute was adopted for the protection of the community and its residents. not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed.' [Citation.]"

Appellant was fully advised of his constitutional rights. He understood his rights and elected to talk about what had occurred in the robbery and the killing. This case was tried on January 27, 28, 31 and February 1, 1965. The rules of *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed. 2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] are not the rule of this case. (See *People* v. *Rollins*, 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) The facts and circumstances of taking the statements, which were recorded are such that it is clear Hutchinson intelligently waived his rights and made his election. (See *People* v. *Wilson*, 66 Cal.2d 749, 766 [59 Cal. Rptr. 156, 427 P.2d 820] ; *People* v. *Thomas*, 65 Cal.2d 698. 704-705 [56 Cal.Rptr. 305, 423 P.2d 233] ; *People* v. *Eli*, 66 Cal.2d 63, 72-73 [56 Cal.Rptr. 916, 424 P.2d 356].)

There was no objection to the written statement of Hutchinson going into evidence. An objection now, under the circumstances, comes too late. (*People* v. *Palmer*, 236 Cal.App.2d 645, 650 [46 Cal.Rptr. 449].)

40

■ There was ample probable cause for the officers under the facts as herein stated to make the arrest of Hutchinson and Young when they did so. (*People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Carnes,* 173 Cal.App.2d 559, 566 [343 P.2d 626]; *People* v. *Porter,* 196 Cal.App.2d 684, 686-687 [16 Cal.Rptr. 886]; *People* v. *Schader,* 62 Cal.2d 716, 722, 725 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Demes,* 220 Cal.App.2d 423, 438 [33 Cal.Rptr. 986]; *People* v. *Schellin,* 227 Cal.App.2d 245, 249-251 [38 Cal.Rptr. 593]; *People* v. *Propp,* 235 Cal.App.2d 619, 627-629 [45 Cal.Rptr. 690].)

It was appropriately said in *People* v. *Schader, supra,* at pages 724-725: "In attributing significance to the latter factor, we note the pertinence of the language of Mr. Justice Jackson in his dissenting opinion in *Brinegar* v. *United States, supra,* 338 U.S. 160, 182 [93 L.Ed. 1879, 1894, 69 S.Ct. 1302]: 'Undoubtedly the automobile presents peculiar problems for enforcement agencies, is frequently a facility for the perpetration of crime and an aid in the escape of criminals. But if we are to make judicial exceptions to the Fourth Amendment for these reasons, it seems to me they should depend somewhat upon the gravity of the offense. If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger.' [Citing authority.] Officer Morris was entitled to protect himself from the dangers that befell Officer McKnight; thus the officer while conducting the investigation had the right to arrest defendant. Under such circumstances as faced this officer, society must risk the arrest of suspects who are innocent rather than subject officers to needless hazards in effecting the arrest of suspected armed murderers."

This court called for and ordered the original record in this case to this court. From the testimony taken in the penalty phase of the case, when both Hutchinson and Young testified it is clear that each was guilty of murder in the first degree

and of first degree robbery. The probation officer's report contains a statement of Hutchinson's to the effect that "work and me don't get along too good—can't see eye to eye," that although he was only 18 years of age he had made lots of money hustling, that he had peddled a little dope and that since the time he was released by the California Youth Authority he had used marijuana almost every day because it gave him "a nice trip"—further, that he was ready to do his time, but when he gets out he probably will have to go to work because by that time he will have lost his contacts for dope and prostitutes. The probation officer reported that seemingly Hutchinson is proud of his criminal record.

The judgement is affirmed.

Wood, P. J., and Lillie, J., concurred.