MOSS,
 
 J.
 

 A jury found defendants guilty of murder of one Gadaire in the first degree and fixed the penalty of Boggs at death and that of McKinney at life imprisonment. The court reduced the sentence of Boggs to life imprisonment. A third defendant, Elbert Gilhousen, was allowed to withdraw his plea of not guilty at the outset of the trial before the jury was impaneled, and at his request, was sentenced immediately. Defendants’ motions to sever their trials were denied.
 

 Boggs contends that (1) an oral confession which he gave to the police was involuntary and the court therefore erred in receiving evidence on the subject, and (2) he was prejudiced by the deletion from his confession of all reference to McKinney’s part in the crime and, therefore, it was error to deny his motion to sever. McKinney contends that the evidence was insufficient to connect him with the crime. Both defendants contend that (1) the court committed prejudicial error in receiving in evidence certain photographs of the body of the victim and (2) the court erred in failing to declare a mistrial on its own motion after Gilhousen refused to testify.
 

 Upon returning to work on Monday morning, June 7, 1965, the employees of Nappie’s Service Station discovered that the safe was open and that about $1,400 in cash and some credit cards and checks were missing. The keys were in the station. At 9:30 or 10 p.m. the night before, Gilhousen had appeared at the station and asked where Gadaire, the owner of the station, was because, Gilhousen said, he wanted to return a key to Gadaire. There was someone with Gilhousen at the time; the two men sat in a small foreign compact car. Another employee had seen Gilhousen drive past the station at 1 or 2 p.m. on June 6, 1965. At about 10:15 p.m. on June 6, Gilhousen went to the home of Danny Sadler, one of the managers of the station, and asked where he could find Gadaire, saying that he wanted to give Gadaire a house key. Sadler told Gilhousen he thought Gadaire was at home. Gilhousen had worked at the station three months earlier. Sadler had once seen Gilhousen and Boggs together at the station.
 

 Sadler and another employee then went to Gadaire’s home where they found his dead body lying in the living room. His hands were bound and his mouth was gagged. His head was tied back at a sharp angle. There were numerous bruises about
 
 *693
 
 the head and face. The jaw and ribs were broken. The injuries were the kind produced by a fist or blunt instrument. Large quantities of blood were on the floor under and near the body and on one of the walls. There was a round hole in one wall about 3 inches in diameter about 2 feet above the floor. Tools from the fireplace, two bottles and glass fragments were strewn about. An autopsy revealed the causes of death were primarily strangulation and a broken neck.
 

 The Admissibility of Boggs’ Confession.
 

 “It is the duty of a reviewing court to examine the uncontradicted facts in order to determine independently whether a confession was voluntary.”
 
 (People
 
 v.
 
 Trout,
 
 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) Evidence of the circumstances surrounding the confession of Boggs is partially in conflict. The evidence shows: The police left a message with the manager of the apartment house in which Boggs lived that they would like to be informed when Boggs returned home. Later Boggs telephoned in and the police asked him to come in voluntarily. At 9 :55 p.m. on June 7, 1965, Boggs came to the police station of his own accord accompanied by his wife. At this time Gilhousen had not yet made any statements connecting Gilhousen and Boggs with the death of Gadaire. Boggs was taken to an interrogation room by Sergeants Hallinen and White. Mrs. Boggs remained in the lobby with Sergeant Rowley.
 

 Sergeant Hallinen advised Boggs that Gilhousen had said that Gilhousen and Boggs had been together on June 6, 1965, and asked Boggs about his activities on that day. Boggs related that he had ridden around in his car with Gilhousen, that they hadn’t done much, just looked around, that they had been to Boggs’ apartment during the day, and that they had eaten together at Boggs' apartment that evening. Boggs also told the officers that he and his wife had each left the apartment for a while that evening. After 10 minutes of conversation with Boggs, Sergeant Hallinen became suspicious of Boggs because of inconsistencies between his account of the day’s activities and that of Gilhousen and thereupon advised Boggs that he was a suspect in the case and explained to him his constitutional rights including his right to have an attorney at any time from then on. Boggs said he understood his rights. Sergeant Hallinen then asked Boggs many specific questions about his activities with Gilhousen the day before
 
 *694
 
 (June 6). Boggs made no statements that implicated either himself or Gilhousen in the death of Gadaire. During this conversation the only persons present Avere Boggs and Sergeants Hallinen and White. At about 10:15 p.m. Sergeant Hallinen received a telephone call concerning the case and left. He returned about 1:30 a.m. During his absence, Sergeant Hallinen learned that the police had reeoArered clothes and money pertaining to the ease and obtained from Gilhousen information concerning his participation in the case from which could be inferred the participation of other people.
 

 In the meantime, Mrs. Boggs had remained in the lobby with Sergeant Rowley for 30 to 45 minutes. He then took her to a coffee room where they had a cup of coffee and talked. She was taken to several other rooms in the station in which she waited for a while and then was taken to the room where her husband was. She remained in the room with her husband for several hours until Sergeant Hallinen returned. An officer stayed in the room with them.
 

 When Sergeant Hallinen returned to the station he advised Boggs in the presence of Mrs. Boggs and Sergeant White that he had received additional information and physical evidence which led him to believe “that both he, Gilhousen, Mrs. Boggs, certain vromen and another person were involved in this case” and “it was my intention unless I learned otherwise that it Avould be necessary for me to hold all these people that I mentioned,” and “that would definitely mean booking.” Sergeant Hallinen admitted asking Boggs, “why he would let his wife get involved in this!” Boggs said his Avife was not implicated in any way, that she had no knowlof it and that he would like to talk about it. He kept asking Sergeant Plallinen to let Mrs. Boggs go.
 

 At this point, having noticed that Mrs. Boggs seemed upset, Sergeant Hallinen sent her out of the room with a matron who was instructed to stay with her. Mrs. Boggs testified that she had been at the station for about two hours before she learned the purpose of their visit. Someone told her “it was about murder.” She said she was not too worried at that point, however, “because I didn’t know what they were thinking. ’ ’
 

 The foregoing account of what took place after Sergeant Hallinen returned to the interrogation room is taken from the testimony of Sergeants Hallinen and White. Boggs and his
 
 *695
 
 wife gave a different account. They testified that after he returned, Sergeant Hallinen said, “What kind of a man are you to let your wife he dragged into something like this and your children taken to Juvenile Hall? If you cooperate with us, we’ll let your wife go.” They testified that after Boggs denied knowledge of the crime, Sergeant Hallinen took Mrs. Boggs by the arm, walked her to the door, and shouted down the hall, “Book them both for murder.” They testified that Boggs then stated, “Oh no, don’t do that. I will tell you what you want.” The police then escorted Mrs. Boggs to another room where a matron joined her.
 

 Sergeants Hallinen and White denied that either of them made the statements attributed to them by Mr. and Mrs. Boggs.
 

 Boggs made an oral confession which was taken down and transcribed by a stenographer. The confession began at 1:54 a.m. and ended at 2:47 a.m. Boggs stated that he had been advised of his rights and made the statement voluntarily. He then related how he and Gilhousen had participated in the murder of Napoleon Gadaire.
 
 [1]
 
 On the morning of Sunday, June 6, 1965, Boggs and Gilhousen decided to rob the safe at Gadaire’s service station that day because they knew that Gadaire took the money to the bank on Monday. They went to Gadaire’s station and asked where Gadaire lived saying that they had a key to return to him. They also went to the house of one of the managers of the station with a similar request. Boggs drove them in his car. After learning Gadaire’s address, they rang his bell some time after 1:30 a.m. on June 7, 1965. When Gadaire opened the door, they pushed their way in, wrestled him down and beat him into unconsciousness. In the struggle a hole was knocked in one of the walls by Gadaire’s head. They then bound and gagged Gadaire. Boggs’ description fit the condition of the body and the premises as found by the police the morning after. Boggs said they then went to Gadaire’s station where they removed about $1,400 in cash of which Boggs received about $430. He said he still had most of the money which a friend of his in Long Beach was holding for him.
 

 
 *696
 
 .-Immediately after.Boggs gave his statement, he was allowed to visit with his wife for a few minutes. After this visit, Mrs. Boggs was told she could go home. Sergeant Hallinen estimated the time of her release as 3 a.m.; Mrs. Boggs stated the time to be 6 :45 a.m. The matron (who had joined Mrs. Boggs around 1:30 a.m.) testified that she sat with Mrs. Boggs for two or three hours. During that time Mrs. Boggs expressed concern for her children.
 

 After Boggs had confessed he went with Sergeant Rowley to Long Beach where they recovered the money that Boggs had left with his friend. Rowley asked Boggs if the money which the friend had returned was all the money that Boggs had got from this “gas station job." Boggs replied, “Most of it" and said that he had spent about $100 of it and thought there was about $300 remaining. Sergeant Rowley counted $316 in bills and change.
 

 The prosecution had the burden of proving that Boggs’ confession was voluntary.
 
 (People
 
 v.
 
 Berve,
 
 51 Cal.2d 286, 291 [332 P.2d 97].) The use in a criminal prosecution of involuntary confessions constitutes a denial of due process of law under both the federal and state Constitutions.
 
 (People
 
 v.
 
 Kendrick,
 
 56 Cal.2d 71, 83 [14 Cal.Rptr. 13, 363 P.2d 13] ;
 
 People
 
 v.
 
 Trout, supra,
 
 54 Cal.2d 576, 583.) Historically, forced confessions were excluded because they were deemed to be untrustworthy. (3 Wigmore on Evidence (3d ed.) § 822, p. 246.) Later the rationale was said to be that due process is denied when a confession is obtained by use of police methods which the law should not sanction. (For a thorough discussion of the historical background of this concept see
 
 People
 
 v.
 
 Ditson,
 
 57 Cal.2d 415 at pp. 436 to 440 [20 Cal.Rptr. 165, 396 P.2d 714].) A threat to arrest a near relative can constitute an offensive police practice which will bar evidentiary use of a confession coerced thereby.
 
 (People
 
 v.
 
 Trout, supra,
 
 54 Cal.2d 576;
 
 People
 
 v.
 
 Matlock,
 
 51 Cal.2d 682, 697 [336 P.2d 305];
 
 People
 
 v.
 
 Rand,
 
 202 Cal.App.2d 668 [21 Cal.Rptr. 89].)
 

 Boggs contends that his confession was inadmissible because it resulted from improper pressure from the police. The fact that a defendant believes or hopes that his confession may result in the exoneration of others does not render it involuntary as a matter of law.
 
 (People
 
 v.
 
 Kendrick, supra,
 
 56 Cal.2d 71, 86;
 
 People
 
 v.
 
 Abbott,
 
 156 Cal.App.2d 601, 605 [319 P.2d 664].) “So long as the methods used
 
 *697
 
 comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.”
 
 (People
 
 v.
 
 Garner,
 
 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680] [concurring opinion].) The fact that the confession of Boggs may have been motivated by a desire to clear his wife does not render his confession inadmissible unless the uncontradicted facts show that the police held Mrs. Boggs in custody for the purpose of securing a confession from Boggs.
 
 (People
 
 v.
 
 Trout, supra,
 
 54 Cal.2d 576;
 
 People
 
 v.
 
 Rand, supra,
 
 202 Cal.App.2d 668.) The uncontradicted facts do not support Boggs’ contention.
 

 Mrs. Boggs went to the police station of her own volition. She did not know why her husband had been asked to come in and did not find out until 1:30 a.m., three and one-half hours after she arrived. Some time during that period she learned that the subject of the investigation was a murder but she did not worry because at that point she did not know her husband was a suspect. There is no evidence that she asked to leave during this time or that she was not free to leave any time she wished. When Sergeant Hallinen returned, he told Mr. and Mrs. Boggs that he had obtained information from Gilhousen from which he concluded that Mrs. Boggs and other women may have been involved in the crime. There is nothing in the record which requires us to conclude that Sergeant Hallinen spoke in bad faith. Gilhousen had been at the Boggs’ apartment during the day of the murder and had dined with them. Both Mr. and Mrs. Boggs had gone out after dinner and were away during the time when the murder had been committed. These were circumstances which justified Sergeant Hallinen’s suspicion of Mrs. Boggs. Hallinen’s question to Boggs as to why he would let his wife get involved can reasonably be construed as an expression of concern. The other statements attributed to Sergeant Hallinen by Mr. and Mrs. Boggs were denied by both Sergeants Hallinen and White, the only other persons present at the time the statements were allegedly made. Even though Boggs may have decided to confess in order to clear his wife, the record does not show that he reached this decision as the result of improper conduct by the police.
 

 People
 
 v.
 
 Trout, supra,
 
 54 Cal.2d 576] and
 
 People
 
 v.
 
 Rand, supra,
 
 202 Cal.App.2d 668, do not require a different result. In both of those cases the defendants confessed after -being arrested in their homes where the uncontradicted facts'showed
 
 *698
 
 that the arresting officers threatened to arrest the families of the defendants for the purpose of eliciting the confessions. In this case, as we have shown, Mrs. Boggs freely came to the station and was detained after the police had received evidence which they reasonably believed made her an accomplice in the crime. The fact that she expressed concern for her children to the matron does not require a conclusion that the police threatened to take her children. Sergeant Hallinen said he was unaware that Mr. and Mrs. Boggs had children. It is reasonable to conclude that Mrs. Boggs was not reacting to a threat, but rather was expressing the natural concern of a mother whose husband was being charged with a serious crime.
 

 The Denial of the Motions to Sever.
 

 After Gilhousen changed his plea to guilty, the court denied defendants’ motions to sever. Before being introduced in evidence, the confession of Boggs was edited to delete all references to McKinney. Boggs contends that the effect of the deletions was to make him appear to be the most guilty party. The unedited version of the confession places primary blame on McKinney for instigating the robbery, estimates that McKinney inflicted 80 percent to 90 percent of the blows on Gadaire’s body and states that McKinney did the actual strangling. With all references to McKinney deleted, Boggs argues, it appears from the confession that the entire beating was administered by Boggs, even though he confessed to striking Gadaire only two or three times, because the confession stated that Gilhousen was in another room during the assault on Gadaire.
 

 The rules of
 
 People
 
 v.
 
 Aranda,
 
 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], apply in this case because the judgments of conviction are not yet final.
 
 (People
 
 v.
 
 Charles,
 
 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545].)
 
 Aranda
 
 held: “When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance
 
 *699
 
 of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible.” (63 Cal.2d 518, 530-531.)
 

 Although the deletions did have the effect which Boggs contends they did, we cannot say that he was prejudiced thereby on the guilt issue. In his confession he admitted his participation in burglarizing Gadaire’s house, in attacking and immobilizing Gadaire, and in taking money from the victim’s service station. He thereby confessed to first degree murder as a matter of law. (Pen. Code, § 189
 
 ;
 
 Pen. Code, § 31.) Once the jury accepted his confession as voluntary, it could not have found him guilty of a lesser crime had it known of McKinney’s role in the murder. We do not see how the deletions could have affected the jury’s determination that the confession was voluntary, but the deletions may very well have prejudiced Boggs at the penalty phase of the trial. This conclusion is supported by the fact that the jury sentenced Boggs to death while punishing McKinney with life imprisonment. The jury had the option of sentencing both defendants to death or life imprisonment. (Pen. Code, § 190.1.) Any prejudice to Boggs in the penalty phase of the trial resulting from the deletions was eliminated however by the court’s action in reducing his sentence to life imprisonment.
 

 The Sufficiency of the Evidence against McKinney.
 

 McKinney contends that the evidence was insufficient to connect him with the crime.
 

 McKinney testified on his own behalf: He had known Gilhousen and Boggs for over a year prior to June 6, 1965. He had known Gadaire three years before at his sister’s bar. He spent the morning of June 6 with Mr. and Mrs. Boggs. He then went to his sister-in-law’s house in Bellflower because he was ill and at 7:30 p.m. some relatives took him to Dr. Johnson in Torrance. The doctor diagnosed his illness as bronchial pneumonia and prescribed medication which McKinney purchased. He returned to the house in Bellflower where he spent the night. At 5 :30 a.m. his wife awakened him. Gilhousen was at the front door. Gilhousen said he had just robbed Gadaire. When McKinney asked what happened, Gilhousen replied,
 
 *700
 
 “he just tied him up.” Gilhousen told McKinney he had $1,000 and McKinney asked for a loan of $300. He told Gilhousen he wanted to go to New York to sell some property and promised to pay Gilhousen $500 after the property was sold. Gilhousen thereupon gave McKinney $300, $275 of which was in bills and the remainder in coins contained in a brown paper bag. McKinney gave his wife about $125 in bills and all of the change. McKinney heard on the radio that Gadaire was dead. At midnight McKinney departed for Buffalo, New York. He gave as his reason for leaving town, “Well, because I had part of the money—I guess it came from there—I had part of the money and I had done time” in 1956 for theft over $50. When he got to Buffalo he learned the police were looking for him. He “got more scared” and went to Niagara Palls where he stayed about one week and then turned himself in to the police. McKinney denied any participation in the crime.
 

 Dr. Charles Johnson in his testimony confirmed McKinney ’s visit to the doctor in the evening of June 6,1965.
 

 Sergeant Hallinen questioned McKinney after his extradition to Los Angeles. Before questioning him, Hallinen advised McKinney of his constitutional rights including his right to counsel. McKinney said he understood Ms rights. Sergeant Hallinen testified, ‘ ‘ I asked him how much money he got. He said ‘I didn’t get an even split but I can’t tell you why' ... In answer to another question he said ‘I was scared. I didn’t realize how serious Nappie was hurt until you told me. I don’t think—maybe I’m talking too much. Maybe I should talk to my attorney.’ ” Three days before questiomng McKinney, Mrs. McKinney had given Sergeant Hallinen the paper bag containing coins that McKinney had given her.
 

 McKinney’s testimony was in conflict with Sergeant Hallinen’s concerning his conversation with Hallinen. McKinney testified that Sergeant Hallinen had first used the word “split” and that “I told Mm I didn’t get any part of the split” rather than “I didn’t get an even split” as Hallinen had testified. McKinney’s testimony was also in conflict with the statement he had given Sergeant Hallinen concerning his knowledge of Gadaire’s condition. McKinney testified that he had heard over the radio on June 7, 1965, that Gadaire was dead and that it was this information that scared him into running away. On June 23, 1965, he told Sergeant Hallinen that “I didn’t know how serious Nappie was hurt until you told me. ’ ’
 

 
 *701
 
 In reviewing the sufficiency of the evidence an appellate court “must assume in favor of the verdict the existence of every fact that the jury could reasonably deduce from the evidence and then determine whether or not a reasonable jury could find the defendant guilty beyond a reasonable doubt. . . . ‘It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this boundary is the existence or nonexistence of a reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make. The law recognizes that the scope of a reasonable mind is broad. Its conclusion is not always a point certain, but, upon given evidence, may be one of a number of conclusions. Both innocence and guilt beyond reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. The judge’s function is exhausted when he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind. ’ ”
 
 (People
 
 v.
 
 Huizenga,
 
 34 Cal.2d 669, 676 [213 P.2d 710].)
 

 Where a defendant gives an explanation which is shown to be untrue as to a material fact that has been established by evidence the jury may reasonably conclude that the explanation is an intentional fabrication indicating consciousness of guilt and the absence of any true exculpatory explanation.
 
 (People
 
 v.
 
 Wayne,
 
 41 Cal.2d 814 [264 P.2d 547]; see
 
 People
 
 v.
 
 Albertson,
 
 23 Cal.2d 550, 581-582 [145 P.2d 7] [concurring opinion].)
 

 We conclude that the evidence was sufficient to support the judgment against McKinney. He admitted having possession of the stolen money less than four hours after the robbery took place. His characterization of this money as his share of the “split” justifies an inference that he received it as the result' of some prior agreement with Gilhousen, who had pleaded guilty to the murder. McKinney’s statement to the investigating officer that he did not “know how serious Nappie was hurt until you told me” implies that he knew
 
 *702
 
 before that time that Nappie had been hurt. According to McKinney’s explanation, Gilhousen had told him only that he had tied Nappie up. The jury could reasonably have inferred from McKinney’s statement to the police that he knew Nappie had been hurt because he was present when it happened. McKinney fled to New York the same day the murder was committed. He admitted knowing that Nappie was dead, and since he said he heard this news on the radio, the jury was justified in inferring that he knew Nappie had been murdered. His flight under these circumstances indicated consciousness of guilt of a serious crime. The jury obviously disbelieved McKinney’s explanation of how he obtained the money and the reason for his flight, and was justified in concluding from the bizarre nature of McKinney’s account of the loan transaction with Gilhousen in the early morning hours following the murder, the inconsistencies in McKinney’s testimony and the prior contradictory statements that he had made to Sergeant Hallinen that McKinney had intentionally falsified his story to conceal his guilt.
 

 The other evidence at the trial strongly suggests that a third person participated in the killing. Boggs’ confession stated that he struck Nappie only two or three times and that Gilhousen did not participate in the assault. The testimony and the photographs of the victim show that he was cut and bruised innumerable times all over his head and body. There was no evidence offered that was in any way inconsistent with the conclusion that McKinney was also present at the killing. (Compare
 
 People
 
 v.
 
 Hall,
 
 62 Cal.2d 104 [41 Cal.Rptr. 284, 396 P.2d 700];
 
 People
 
 v.
 
 Jones,
 
 24 Cal.2d 601 [150 P.2d 801];
 
 People
 
 v.
 
 Draper,
 
 69 Cal.App.2d 781 [160 P.2d 80].) Therefore, we hold that the evidence is sufficient to support the finding that McKinney was one of the killers.
 

 The Photographs of the Victim.
 

 Defendants contend that the trial court erred in admitting in evidence over objection five 8" xlO" color photographs and two 5" x
 
 1"
 
 black and white photographs taken at the victim’s apartment and at the morgue showing his body in various poses. The body appears to be bound with the hands and feet drawn up against the back. A bloody cloth is bound across the victim’s mouth and appears to be pressing hard against the mouth which was apparently forced open to receive the gag.
 

 “When allegedly gruesome photographs are pre
 
 *703
 
 sented, the trial court must decide whether their probative value outweighs their probable prejudicial effect.”
 
 (People
 
 v.
 
 Love,
 
 53 Cal.2d 843, 852 [350 P.2d 705].) Necessity is not the test for determining the admissibility of such photographs, but rather, relevancy.
 
 (People
 
 v.
 
 Harrison,
 
 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665].) Even though the photographic evidence was largely cumulative and might properly have been excluded, the trial court need not be held to have abused its discretion by admitting it.
 
 (People
 
 v.
 
 Love, supra,
 
 53 Cal.2d 843, 852-853.)
 

 The photographs in the present case are unpleasant to view and to a large extent illustrate the testimony of the autopsy surgeon and the persons who found the body. However, the photographs illustrate, in a way that the testimony does not, the force that must have been required to bind and gag the victim, and so were relevant on the issue of how many persons participated in the killing. As to Boggs they tended to show that his part must have been greater than that to which he confessed. As to McKinney, they tended to show that there must have been a third man present to overcome a man of Gadaire’s apparently muscular physique. The trial court did not abuse its discretion in admitting them as to both defendants.
 

 The Failure of the Court to Declare a Mistrial after Gilhousen Refused to Testify.
 

 Defendants’ final contention is that the trial court committed prejudicial error in failing to declare a mistrial on its own motion following the refusal of their codefendant Gilhousen to testify.
 

 In the
 
 voir dire
 
 examination of the prospective jurors the prosecution referred to the fact that an accomplice would be called as a witness. On the first day of trial, Gilhousen changed his plea to guilty and was immediately sentenced to life imprisonment The record shows that the prosecution sought Gilhousen’s testimony in order to preclude the trial court from having to grant defendants’ motions to sever as otherwise might have been required by the rule of
 
 People
 
 v.
 
 Aranda, supra,
 
 63 Cal.2d 518. When Gilhousen was called to the stand as a witness for the People, he refused to testify. The prosecutor was apparently surprised by Gilhousen’s refusal. He offered to stipulate to a mistrial, but both defense counsel declined the offer. The record discloses that the prosecutor acted with complete fairness. Having refused to stipu
 
 *704
 
 late to a mistrial, defendants may not on appeal assert that it was error for the court to do what they explicitly opposed doing at the time of trial.
 

 The judgments are affirmed.
 

 Cobey, Acting P. J., and Shinn, J.,
 
 *
 
 concurred.
 

 A petition for a rehearing was deemed denied December 7, 1967, pursuant to rule 27(e), California Rules of Court. Appellants’ petition for a hearing by the Supreme Court was denied January 17, 1968.
 

 [1]
 

 The statement described how defendant McKinney was the prime instigator of the robbery and the most violent of the three participants in the murder. All reference to McKinney was deleted from the confession before it was received in evidence. The prejudicial effect of this deletion on Boggs ’ ease is considered below.
 

 *
 

 Betired Presiding Justice of .the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.