[Crim. No. 12426. Second Dist., Div. One. Oct. 28, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL SCHWARTZMAN et al., Defendants and Appellants.

874

David Unrot, under appointment by the Court of Appeal, and Herbert M. Porter for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Stanton J. Price, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—Michael Schwartzman, Michael Franz, and Allan Joseph Watson each appeals from his conviction of murder in the second degree.

The three appellants and one John Anthony Schumacher were together charged by information with the murder of Charles James Clark in violation of section 187 of the Penal Code. Appellants were duly arraigned with counsel and each pleaded "not guilty." Their joint motion for separate trials was denied and the appellants were jointly tried.

Appellants raise the following contentions: (1) The confession of each was improperly admitted in evidence; (2) Transcriptions prepared from tape recordings of statements made by Schwartzman and Franz to the police were improperly admitted in evidence; (3) The confessions of each of the codefendants were improperly admitted at the joint trial; (4) Certain statements made by the prosecutor in his opening address to the jury were erroneous and prejudicial; (5) The

court erred in refusing to allow Schwartzman to explain injuries he received in jail during the trial; (6) The court abused its discretion in permitting the prosecutor on cross-examination of certain witnesses to exceed the scope of direct examination; (7) The court made comments prejudicial to defense counsel in the presence of the jury; (8) The evidence is insufficient to sustain the conviction of Franz; (9) The court denied defense counsel the right to cross-examine certain witnesses; (10) The prosecutor misstated the facts in his closing statement to the jury; (11) The court in its instructions to the jury improperly defined burglary and incorrectly described the defense of diminished responsibility; (12) These cumulative errors resulted in a miscarriage of justice. The contentions raised by appellants lack merit.

To the degree that the facts may be ascertained, the evidence is not in conflict. The homicide occurred at the house maintained by Phi Beta Chi, an off-campus fraternity for students at El Camino Junior College for meetings and social gatherings. The victim was one of the few members who lived in the two-story frame house on Glasgow Street in Inglewood, California. The entry of the fraternity house opened upon a center hall which ran from front to back of the building. To the left a doorway led to the game room, the fraternity meeting room and the bathrooms. Opening to the right was a parlor, frequently used as a dance floor, and a den. Beyond the den a pantry offered access to the kitchen. The members kept a turntable, an amplifier and a speaker system in the den closet and a large supply of records in the pantry. There was a flight of stairs which opened off the front hall, made a right angle turn halfway up and led to the second floor where there were three bedrooms, an "active" room, and a glass-enclosed front porch.

At about 1 p.m. on Sunday, July 25, 1965, Larry Pogue, a nonresident fraternity member, visited the house. He found Charles James "Chuck" Clark playing ping pong with Pat McGuire and remained with them until about 3 p.m. During his visit he noticed that the turntable, amplifier and speaker system were set up in the parlor and several large, empty liquor and champagne bottles, which had been cleaned when the house was painted a couple of months earlier, decorated the den walls. At about 8 p.m. that same day, William Arkenberg, president of the fraternity, visited the house with his fiancee, Ann O'Shaughnessy. They joined Pat McGuire, John Coventry, Chuck Clark, and several unidentified girls in an

informal social gathering. Ann played ping pong with Arkenberg in the game room until about 10 p.m. and then talked with a couple of the other girls in the parlor for an hour or so. Neither she nor Arkenberg saw anyone unfamiliar enter the house during that time.

Chuck Clark went upstairs to his bedroom, which was located beside the active room at the front of the house, shortly after 10 p.m. At about 11:30 p.m. Arkenberg took his fiancee upstairs to the active room where they listened to the radio, talked and kissed. About 15 minutes later they heard a car door close and the voices of men talking outside. Then the front door slammed and they heard people running from room to room and pushing objects around below. Ann became afraid and Arkenberg, who thought the whole house was being ransacked, stepped out onto the front porch to have a look outside. He saw a figure on the porch downstairs and another near the corner of the house, then heard someone say "There's somebody up there with glasses on" but couldn't see the speaker. When he returned to the active room, Arkenberg heard the clatter of persons mounting the stairs and just as he reached the door to the hall he heard a voice say "I think there's somebody in there. I am going to kick the door in." Arkenberg locked the door just before someone kicked it vigorously and he held it until they gave up the attempt to get in.

Shortly thereafter the couple in the active room heard the sound of bottles breaking and someone moaning in the adjacent bedroom. They fled in fear through the upstairs porch window and clambered out onto the roof. From that vantage point they saw a man leave the fraternity house. Arkenberg shouted out that he had called the police and then he and Ann began calling for help. The person on the lawn ran back into the house yelling "They had [sic] called the police." The couple saw several figures run out and away from the house and people also started to come out of the adjacent buildings.

Ann and Arkenberg remained on the roof until they saw a police car turn onto the street. When they returned to the house through the active room they noticed that the door had been broken open and the molding around the door torn loose. The door to the adjacent bedroom was open and the light was on. They went in and found Chuck Clark lying face down on the bed, moving slightly but unconscious. The room had been ransacked. Drawers were pulled out and overturned. Papers, bits of glass and clothing were strewn about. One of two large

green ceramic ashtrays belonging to the fraternity was lying on Chuck's back. Ann placed the ashtray on the floor, then took Chuck's hand and tried to talk to him but he made no response. Arkenberg met the police officers on the stairs, told one of them to call an ambulance, and returned with the others to Chuck's room.

Officer Arnold Gerardo and his partner, John Taylor, arrived at the fraternity house at about 12:30 a.m. the morning of July 26, 1965. They entered through the open door and saw that the house had been ransacked. Bottles, glasses and pans were strewn around the lower floor. They went upstairs, and found Chuck lying face down on his blood-covered bed in a room littered with debris, glass and ashtray fragments. They saw the neck of a broken bottle and another large unbroken bottle on the floor. Chuck had a large gash on the top of his skull and blood oozed from his ears, nose and mouth. He moaned faintly but did not recover consciousness before the ambulance arrived to remove him to the hospital.

At Centinella Valley Community Hospital, Leslie E. Geiger, neurosurgeon, administered emergency treatment but found Chuck's brain so bruised, swollen, bloodstained and cut on the under-surface that he diagnosed the victim's condition as desperate and terminal. Chuck was placed in the intensive care unit but because of his condition no extensive surgery was attempted. He died on August 10, 1965, without regaining consciousness. Death resulted from depressing injuries to his skull, inflicted at two separate areas on his head, which lacerated the tissue and caused blood clots to form on the brain.

At about 1:20 a.m. on the morning of July 26, Officer Cooper, identification technician for the Inglewood Police Department, visited the fraternity house and observed the evidence of vandalism. He obtained four latent fingerprints from the ashtray which he found on the floor between the two beds in Chuck's room. He also lifted fingerprints from the glass sides of champagne bottles that were found in the bedroom and upstairs hallway. When fingerprint exemplars obtained from Franz, Watson and Schwartzman after their arrest were compared with those taken from the ashtray and bottles it was discovered that Franz' left index fingerprint appeared on the green ashtray, Watson's right index fingerprint was on one of the champagne bottles found upstairs and Schwartzman's left middle fingerprint appeared on another champagne bottle.

When Pat McGuire returned to the house the morning after

the homicide he found the front door and the game room door torn from their hinges. The door to the active room also was torn off its hinges and the frame was damaged. The amplifier was missing, the pingpong table was torn down, and the furnishings were in disarray. Larry Pogue who also visited the house that day found the speaker destroyed and noticed that the champagne bottles had been taken out of the den. One lay at the bottom of the stairs, one lay on the landing between the flights of stairs, a third he found in the upstairs hallway and a fourth stood on the dresser in Chuck's bedroom. A broken champagne bottle and a broken whisky bottle lay on the floor near Chuck's bed. The contents of the dresser drawers were spilled on the floor amongst broken bits of glass from bottles, ashtrays and mirrors, and the blood-stained sheets, mattress and blanket. The Sony transistor radio which Chuck customarily kept on his dresser was not there that morning.

On the evening of the homicide, Judy Smith and Cathy Cronkhite, who lived across the street from the fraternity house, gave a party. The three codefendants and John Schumacher were guests at the party. Sometime during the evening Franz and another guest, Robert Sherman, went across the street, raided the fraternity house pantry, and returned with some records. Sherman announced to the assembled party that the records came from the fraternity house and shortly thereafter Watson and Schumacher separately left the party. Schumacher testified that once outside the house he heard loud noises coming from the fraternity house. Upon investigation he found his three friends, Franz, Watson, and Schwartzman, in the den at the fraternity house. He said, ''Come on, let's get out of here'' and went back to the party. When the others didn't return he decided they hadn't heard him and returned to the fraternity house. Schumacher found Watson was walking up the fraternity house stairway and joined him. Once upstairs Schumacher pointed to a closed door and told Watson, ''I think there's somebody in there.'' Watson vigorously kicked the door, but he couldn't get it open.

A few minutes later Schumacher found an open bedroom door. He entered and there he found Franz and Watson. They were immediately joined by Schwartzman who entered from an adjoining dressing room. Schumacher saw clothes strewn on the floor, drawers turned over, and a young man asleep face down on the bed. Suddenly the young man appeared to be waking. Schumacher watched for a moment to see what

would happen, then picked up a Sony radio from a nearby dresser top and started to leave. As he did so he looked over his shoulder and saw that Schwartzman and Watson had approached the young man on the bed from the left and Franz was coming toward the bed from the right. Schumacher saw someone to the left strike Chuck on the head or shoulders with a bottle with such force that it broke. Schumacher saw someone strike Chuck once again from the left before he finally turned away. Chuck started to get up on his elbows, but Schumacher did not see whether he ever reached an upright position because he ran away down the stairs. As he ran Schumacher heard another thud which sounded like the same noise made by the earlier blows. He put the radio under the seat of Watson's car and as he turned to go back to the house, he saw his friends come running out. He also saw figures on the roof of the house and he called to Watson, who had run into the middle of the street, to come and get into the car. The radio and an amplifier which Watson had taken they dropped off in an alley a few blocks from the fraternity house. They then drove to Tiny Naylor's restaurant where they were joined by Franz and Schwartzman. Later Franz returned to the alley with Schumacher and they again picked up the radio and amplifier.

Following these events, Schumacher had individual conversations with his friends, Watson, Franz and Schwartzman, respectively. Watson visited Schumacher at home to talk about the incident. He said, ''I think we killed him'' and also ''said something about going nuts'' at the time of the homicide because he remembered that he had hit the victim once and then again and then laughed as he continued to hit him. Franz, on the other hand, once told Schumacher that he had hit Chuck and on another occasion denied his participation. Schwartzman followed the newspaper account of Clark's condition and once said to Schumacher, ''It was a helluva thing we have done.''

The confessions were obtained by the police from each of the participants in the homicide shortly after their arrest. Schwartzman and Franz were arrested together at Schwartzman's home at around 6 p.m. on September 28th. Police officers handcuffed the two defendants, seated them together on the living room couch, displayed to them the warrants for their arrests and explained the charge of murder. Officer Craw, in the presence of Officer Long, advised the defendants of their constitutional rights and both acknowledged that they

understood the admonitions. Officer Gardner, who later spoke to Schwartzman alone for a few minutes, once again advised him of his constitutional rights.

Officers Long and Craw had a conversation with Schwartzman at police headquarters, about an hour after his arrest in which they told him that his fingerprints had been obtained from a bottle found at the scene of the crime and that there were two witnesses who had been in the fraternity house the evening of July 25. When Schwartzman was again asked to explain what happened, he told the officers that he attended a party across the street that evening. At the party he consumed a fifth of whiskey and an additional half-pint of liquor. He recalled hearing that something was going on at the fraternity house across the street and then leaving the party. He was so intoxicated, however, that he did not remember entering the fraternity house or hitting the victim but he believed that he did these things because his fingerprints were on the weapon. He remembered sitting on the floor in an upstairs room at the fraternity house, opening bureau drawers. He was dumping out the contents and Watson was helping him to shuffle through the articles. At first he didn't know that Chuck was in the room but he remembered later noticing Chuck, who was a stranger to him, lying on his stomach in bed. When Chuck started to roll over in his sleep the defendant became afraid he might awaken and Schwartzman ran downstairs to find a weapon. He found a large champagne bottle in the bar, ran back upstairs and hit Chuck with it several times. The bottle didn't break, and Schwartzman did not remember seeing any blood, but he claimed that after the crime he ran from the fraternity house to Tiny Naylor's restaurant, a distance of almost two miles.

Several hours later Officers Craw and Long had a conversation with Franz in the same room. After Franz assured the officers that he understood his constitutional rights he told them that on the evening of the crime he attended a party at a house across the street from the fraternity house. He was drinking and inhaling glue that evening, and he could recall little of what happened. He remembered walking up the stairs, and seeing in one of the bedrooms a dark-haired young man who was lying asleep in bed. He thought that later Schwartzman stood on the right side of the bed and Watson stood on the left while they alternately struck the sleeping stranger. Franz saw the stranger getting beaten, saw the glass bottles shattering and noticed that the victim was bleeding

profusely. He threw a large green ash tray which he had picked up from the dresser at the victim on the bed and then ran out of the room because he felt ''shook up.'' When he left the house he took a stack of records with him.

Watson was arrested by Officers Harrington and Webb as he drove into his driveway at about 1 a.m. on September 29. Officer Harrington told him that he was being arrested for murder and immediately advised Watson of his constitutional rights. During the drive to the police department Officer Webb also told Watson about his right to remain silent, his right to have counsel at all times, and that anything he said might be used against him in a court of law. Watson indicated that he understood. Shortly after Watson's arrest, Officers Craw and Long had a conversation with him at the police department. Watson once more said that he understood his constitutional rights and the charge on which he was booked. He then asked whether, if he was going to get an attorney, he had to answer their questions. Officer Craw and Officer Long each told him he did not have to answer anything. Watson thereafter neither requested an attorney nor refused to answer further questions. Schwartzman was brought into the interrogation room a few minutes later and he repeated once more in the presence of Watson many of the details of the incident as he had related them to the officers earlier. Watson, who had been drinking heavily at the party across the street, said he first entered the fraternity house to see whether Schwartzman needed his help. He did not intend to steal when he entered the house but took the speaker from the parlor out to his car because no one was there and then went back to search for Schwartzman. Watson acknowledged that he was in the bedroom with Schwartzman shuffling through the contents of the bureau drawers when the victim started to roll over in his sleep. Until Chuck groaned and started to turn over Watson didn't know he was in the upstairs room. Schwartzman and Watson both feared that Chuck would awaken. They ran downstairs and each apparently returned with a champagne bottle from the den. Schwartzman hit Chuck and Watson admitted that he also struck the victim. At first Watson intended in hitting Chuck merely to knock him out, but he thereafter struck his victim several hard blows, first with a champagne bottle and then with an empty whiskey bottle. Watson felt that he just blew his mind while striking the blows. When the whiskey bottle broke, he became scared and ran outside. He took the stolen items and threw them in

the river. He was so intoxicated that he thought he drove home with John Schumacher, when in fact he took Schwartzman home.

Cathy Cronkhite and Judy Smith testified that the three codefendants and John Schumacher attended their party the evening of July 25, 1965. Franz was already intoxicated from the effects of inhaling glue by the time he arrived at the party. During the evening he drank a lot of beer and half a glass of pure alcohol, and he continued to sniff perhaps eight or ten tubes of glue from a saturated diaper. Cathy, who had observed Franz under the influence of glue fumes on other occasions, said she believed that when he was thus intoxicated he could not comprehend what was going on around him or understand what he was told. He lost sense of time, repeated questions and activities senselessly, and was sometimes angry and hostile under the influence of glue. Cathy knew that in the weeks immediately preceding the crime Franz frequently had been under the influence of glue. Fran Krause also had seen Franz when he was under the influence of glue and had noticed that his speech was incoherent, his eyes glassy, and that he did not appear to understand what she said to him.

The testimony of other guests at the party confirmed that Franz, Schwartzman and Watson each had been drinking heavily that evening. Watson drank nine large cans of beer, a large glass of "white lightning," and a smaller glass of alcohol mixed with orange juice. Alfred Salerno who stayed at the party a short time and then took Judy Smith to a movie, believed that when he left the party around 9:30 p.m. Franz, Schwartzman and Watson were extremely intoxicated. When he and Judy returned from the movie around 1 a.m. on July 26, they saw Franz in the driveway and Franz then acted drunk. He said something unclear about going across the street with some friends and "beating up on a guy." Schwartzman's father was awake when Schwartzman supported by Watson, arrived home in the early morning hours of July 26. Schwartzman was so inebriated that he could not consciously recognize his father and was unable to walk or to undress and get into bed by himself. Ed Pipe, who lived at the Schwartzman home, corroborated the testimony of Schwartzman's father that he was inebriated and very sick on the morning of July 26.

Dr. John Suarez, a psychiatrist, testified that alcohol which circulates throughout the body and affects the central nervous system interferes with the oxygen consumption of the brain

tissue and thus decreases brain functioning. Glue contains some volatile organic chemicals and when it is inhaled these gases enter the blood stream and have a similar intoxicating, or depressing, effect on the brain. When both glue fumes are inhaled and alcohol is consumed, the effects combine, and a person thus intoxicated may experience a loss of memory for events occurring during the period of intoxication and perform acts which he otherwise would not do.

Dr. Alvin E. Davis, a psychiatrist, examined Watson in jail, studied reports from others who knew his behavior when he was drinking and reviewed the trial transcript. He expressed the opinion that at the time of the offense Watson was acutely intoxicated with a blood alcohol level somewhat above .30 percent. A person in this state of intoxication would not be able to form specific intent or to have deliberate control over his actions. Most persons, he testified, become unconscious at a blood alcohol level somewhere between .35 percent and .40 percent and above that level there is danger of death due to cessation of respiration and of heart beat. He further testified that if an individual with a .25 percent blood alcohol also inhaled approximately eight tubes of glue, the level of conscious mental functioning might approximate a stupor or near-coma.

Each of the appellants contends that his statement to the police during the night all three were arrested should not have been admitted into evidence. The confessions in each case were received over objection of counsel. Schwartzman when arrested was an 18-year-old minor and he now contends that because his mother at that time told one of the arresting officers that she would obtain an attorney for him, he did not have the capacity to waive effectively his right to counsel prior to his interrogation. Schwartzman was advised by officers in his home at the time of his arrest and again in his bedroom immediately thereafter of his right to have an attorney present at all times, his right to remain silent, and that anything that he said might be used against him in court. Schwartzman indicated that he understood this advice and only an our later he confessed to police his participation in the crime. ". . . [A] minor, even of subnormal mentality, does not lack the capacity as a matter of law to make a voluntary confession without the presence or consent of counsel or other responsible adult, or to make a knowing and intelligent waiver of his right to counsel at trial; in either event, the issue is one of fact, to be decided on the 'totality of the

circumstances' of each case. We are of the opinion that the same rule governs the issue of the effectiveness of a minor's waiver of his rights to counsel and to remain silent after the accusatory stage has been reached in a pretrial investigation." (*People* v. *Lara,* 67 Cal.2d 365, 389 [62 Cal.Rptr. 586, 432 P.2d 202].) ▮ The minor's capacity to waive his right to an attorney is a function of his individual intelligence, competence, and ability, unrelated to the desires or intentions of his parents. ▮ The record supports the trial court's conclusion that Schwartzman waived his rights with intelligence and understanding.

▮ Appellant Franz urges that he was not advised of his right to have an attorney present at the interrogation, his right to remain absolutely silent, or his right to have the state provide an attorney for him if he was financially unable to pay a private attorney. When Franz was arrested at approximately 6 p.m. on September 28, 1965, at Schwartzman's home he was admonished at the same time and in the same manner as his codefendant of his constitutional rights. Franz was adequately and properly advised of his constitutional rights, including his right to counsel and right to remain silent, under the law prevailing at the time of his trial. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) The trial took place in January and February 1966 and the police were not at the time of Franz's arrest or trial required to advise a suspect that he had a right to have the state provide an attorney for him if he could not pay for legal services. (*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) When his interrogation began at about 11:30 p.m. on the day of his arrest, he was again asked by Officer Craw whether he understood his constitutional rights, including his right to have an attorney present at all stages of the investigation. Franz indicated that he understood the constitutional rights of which he had been advised earlier. This single constitutional admonition was, upon his acknowledgment, sufficient. (*People* v. *Sievers,* 255 Cal.App.2d 34, 37-38 [62 Cal.Rptr. 841].)

▮ Appellant Watson does not contend that he was less than fully advised of his constitutional rights but claims that the police continued his questioning after he requested an attorney and that the police further deprived him of his rights by refusing to allow his father to speak to him. During the course of Watson's interrogation, before he confessed

participation in the crime, he said, ''Well, you, like if I want to talk to you some more, I don't want to say any more until I talk to my lawyer, or something like that. Do I have to answer some of these questions or what?'' Officer Long and Officer Craw each replied, ''You don't have to answer anything.'' Watson thereafter neither requested an attorney nor refused to answer questions. He asked the officers whether he had to answer questions if he was going to see an attorney and they answered straightforwardly and properly by telling him he did not have to answer any questions. Since the trial took place before June 13, 1966, the rule of *Miranda* v. *Arizona* (384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) that once an accused requests an attorney all interrogation must cease until he is represented by counsel does not apply. (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins, supra,* 65 Cal.2d 681, 686; *People* v. *Lookadoo,* 66 Cal.2d 307, 319 [57 Cal.Rptr. 608, 425 P.2d 208].) Watson was fully advised of his constitutional rights under applicable law. (*Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) There is no evidence from which we may infer that if he had requested an attorney, the police would have discouraged his request. Watson thereafter responded to a few more questions. Schwartzman was brought in and in Watson's presence he elaborated upon his previous statement to the officers. Watson conceded the correctness of Schwartzman's admissions, adopted some of Schwartzman's statements, and admitted his participation in the homicide.

■ ''So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.'' (*People* v. *Garner,* 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680]; see also *People* v. *Boggs,* 255 Cal.App.2d 693, 700 [63 Cal.Rptr. 430].) ■ The officers were entitled to confront Watson with the confession of his colleague in crime since he had a right to know the evidence accumulated against him. (*People* v. *Hunter,* 252 Cal.App. 472, 478 [60 Cal.Rptr. 563]; *People* v. *Hutchinson,* 254 Cal.App.2d 32 [61 Cal.Rptr. 868]; and see *People* v. *Fioritto,* 68 Cal.2d 714, 717, 719 [68 Cal.Rptr. 817, 441 P.2d 625].) Watson's father, a Los Angeles police officer, requested permission to see his son shortly after his arrest in order to advise him to say nothing until he had a lawyer. The failure of the police to respond to

the father's request does not affect the validity of Watson's waiver of his right to have an attorney present. Watson has presented no facts which might tend to affect his ability to understand and waive his constitutional rights and the evidence supports the court's implied finding that he had the capacity to make an intelligent waiver. (*People* v. *Lara, supra,* 67 Cal.2d 365, 379.) ██ We conclude therefore, that the confessions of all three appellants were voluntary and were properly admitted into evidence.

██ Schwartzman and Franz contend that the transcripts made from tape recordings of their confessions to the police were improperly admitted into evidence and that the court permitted the introduction of prejudicial, cumulative evidence of their statements. However, the tape recordings and the transcripts thereof were merely marked for identification and were not received in evidence. The transcripts served a single purpose, to refresh the memory of the testifying officer. The statutory rules of evidence applicable at the time of the trial permitted a witness to use a writing to refresh his memory once it was established that the writing was made by the witness or under his direction at a time when the facts were fresh in his memory so that he knew the facts were correctly stated in the writing. (Code Civ. Proc., § 2047, repealed by Evid. Code, § 771.) Officer Craw so testified. Despite the fact that all counsel knew about the recordings prior to trial, at no time was the court's attention directed to any statement which any one of the defendants claimed he had made which was omitted from the tape recordings or transcripts. The trial court properly determined that, despite the lacunae on the transcripts which indicated that the recordings were partially unintelligible, the transcripts were substantially complete and usable to refresh the officer's memory. (*People* v. *Mulvey,* 196 Cal.App.2d 714, 720 [16 Cal.Rptr. 821]; *People* v. *Dupree,* 156 Cal.App.2d 60, 68 [319 P.2d 39]; *People* v. *Ketchel,* 59 Cal.2d 503, 519 [30 Cal.Rptr. 538, 381 P.2d 394].) The fact that the testifying officer first presented his unaided recollection of the conversations and subsequently refreshed his recollection by reading at length the precise words from the transcripts did not constitute prejudicial error. Indeed, this procedure was necessary because defense counsel objected to the introduction of the tape recordings and transcripts themselves.

██ Each of the appellants contends that the extrajudicial statements of his codefendants implicated him in the

crime and were improperly admitted into evidence against him. ▮ It is the established rule in California that:

"When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*People* v. *Aranda,* 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265].) Recently the United States Supreme Court also considered the question. That court held that the introduction of incriminating, extrajudicial statements rendered by a codefendant who does not testify in court violates a defendant's constitutional right of confrontation. (*Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].) This is so because of the substantial risk that the jury, despite instructions to the contrary, may found on such declarations a determination of the defendant's guilt. The principle has been accorded retroactive application. (*Roberts* v. *Russell,* 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921].) ▮ In the present case, the police officer who witnessed the confessions read a large part of the inscribed confession of each defendant to the jury. References to codefendants therein contained were not deleted. Although the introduction of such evidence would ordinarily constitute prejudicial and irreversible error (*Bruton* v. *United States, supra,* 391 U.S. 123), we conclude that under the exceptional circumstances of the present case, no substantial prejudice or miscarriage of justice resulted. First, the court carefully instructed the jury that the confession of each codefendant should be considered only against the declarant. The *Aranda* case held "that the introduction of a confession violative of *Escobedo* and *Dorado* and implicating a codefendant is not rendered harmless as to the latter by the trial court's admonition that the confession may be con-

sidered only against the declarant.'' (*People* v. *Charles,* 66 Cal.2d 330, 343 [57 Cal.Rptr. 745, 425 P.2d 545].) However, as the California Supreme Court observed in the *Aranda* case: ''The giving of such instructions . . . and the fact that the confession is only an accusation against the nondeclarant and thus lacks the shattering impact of a self-incriminatory statement by him . . . preclude holding that the error of admitting the confession is always prejudicial to the nondeclarant.'' (*People* v. *Aranda, supra,* 63 Cal.2d 518, 526-527.) In a subsequent case which was infected with *Aranda* error the court concluded. ''[I]n light of the fact that the evidence properly admitted against Charles *included his own amply corroborated confession,* we find no reasonable probability that Charles would have received a more favorable verdict had . . . [his codefendant's] statement been excluded.'' (*People* v. *Charles, supra,* 66 Cal.2d 330, 343. Emphasis added.) It is extremely doubtful whether the extrajudicial statements of any of the codefendants implicating any one or more of the others in the present case carried the inculpating effect contended by the appellants (*People* v. *Flores,* 68 Cal.2d 563 [68 Cal.Rptr. 161, 440 P.2d 233], as modified.) We have determined that each confession was legally obtained and entirely voluntary, hence clearly admissible against the declarant. Moreover, significantly, each confession merely corroborated substantial independent evidence which linked each of the defendants with the homicide. Each confession was consistent in content with each of the others and also correlated with the statements of witnesses, particularly participant John Schumacher. These confessions, therefore, each established and reinforced other evidence of the circumstances surrounding the crime. It therefore appears that although cross-examination of one or more of the codefendants might have elicited more explicit elaboration of the evidence, not by any stretch of the imagination could it have served to cast a suspicion upon the participation of any of the codefendants or to exculpate any one of them. The reason behind the rule having been obviated, the principles expressed in *Aranda* and *Bruton* have no meaningful application to the facts and conditions composing the present case. ''Even if the trial court should have excluded the statement[s], however, we conclude that the People have proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]'' (*People* v. *Flores,* 68 Cal.2d 563, 568 [68 Cal.Rptr. 161, 440 P.2d 233].) In fact, the admissi-

ble evidence against each of the appellants, as hereinabove described, was overwhelming. Finally, defense of each appellant was based not upon a denial that he performed the deeds which resulted in the victim's death, but upon the defense of diminished responsibility. Each alleged that at the time of the homicide he was so intoxicated that he was not in deliberate command of his senses and did not know what he was doing. Under the circumstances we find that no miscarriage of justice occurred due to the admission of the extrajudicial confessions.

 Appellants Schwartzman and Franz contend that the district attorney in his opening statement to the jury claimed the existence of several facts which he later was unable to establish by the evidence. The contention that the district attorney made these allegations in bad faith is unsupported by the record. Appellants allege that the district attorney stated the following facts which were not based upon the evidence: (1) that Franz and Sherman returned after an absence from the party to say that there were things to steal at the fraternity house and then visited the fraternity house again and returned with some records; (2) that the three defendants agreed that if Chuck Clark woke up they would beat him up with some bottles that they had seen downstairs; (3) that Schwartzman, when asked by police officers whether he was intoxicated on the night of the crime, replied that he was not. In fact, the testimony disclosed that Franz did tell someone at Cathy Cronkhite's party that records or money could be found at the fraternity house across the street and Watson, Schumacher, Franz and Schwartzman later left the party to go to the fraternity house. There was indeed no evidence that the appellants had a prior explicit agreement to beat up the victim with bottles if he awoke. It might be inferred however that there was tacit agreement because when they noticed the victim stir, Schwartzman and Watson, apparently without a word to one another, went downstairs and each obtained an empty bottle for use as a weapon. When they returned all three of the appellants approached and struck the victim. Finally, the transcript of the interrogation shows that Schwartzman did answer once that he was not intoxicated, referring to a different evening, and the prosecutor simply misinterpreted the response. In conclusion, the mere failure of the prosecution to prove every asserted point does not constitute prejudicial misconduct. Nor, in the absence of an affirmative showing of bad faith, does a discrepancy

between the prosecutor's statements and proof constitute reversible error. (Witkin, Cal. Criminal Procedure (1963) 427; *People* v. *Arnold,* 199 Cal. 471, 486 [250 P. 168].)

██ Appellant Schwartzman contends further that the court committed prejudicial error in failing to allow him to explain visible injuries inflicted when he resisted the homosexual advances of a fellow prisoner in jail during trial. The trial court observed that the injuries were not noticeable at a distance of 15 feet and properly prohibited Schwartzman from testifying about this irrelevant matter. The conduct of the trial is within the discretion of the trial court and where no patent abuse is demonstrated, the court's determination must be upheld upon appeal. (Pen. Code, § 1044.)

██ Franz and Schwartzman further contend that the court rejected their requests to cross-examine certain witnesses. ██ Although the right to cross-examine is a significant element in a criminal case, implicit in the constitutional right of confrontation (*Douglas* v. *Alabama,* 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074]), it is within the court's discretion to conduct the trial and limit cross-examination to those matters properly relevant and admissible. (Witkin, Cal. Evidence (1958) §§ 1108-1109.) ██ In each instance cited by these appellants the trial court properly exercised its discretion in limiting cross-examination. Appellant Schwartzman's counsel was not improperly restricted in his attempt to cross-examine the identification technician, Cooper, about his reasons for sending one of the fraternity members, Jerry Rigas, to look for the champagne and whiskey bottles which were strewn about the house following the crime. The court on another occasion complained-of properly sustained an objection to the form of a question put by appellant's counsel to Schumacher concerning whether any of the appellants had doubts about whether they injured the victim; the question in modified form was subsequently allowed. Although appellants object that they were not allowed to ask Officer Craw how frequently he had testified at trials about advising defendants of their constitutional rights, this material was irrelevant and the objection was properly sustained. The trial court also properly sustained objections to questions when the answers would have constituted inadmissible hearsay as, for example, what a police officer's partners had said in his presence or what Mrs. Schwartzman had said to the police officers. In brief, a careful review of the record discloses that appellants' counsel had every opportunity to elicit information which he

now contends he was prevented from discovering and that the trial court properly exercised its discretion in sustaining objections to certain questions which were designed to illicit inadmissible information and to other questions incorrect in form.

Appellants Schwartzman and Franz also contend that the trial court made certain prejudicial comments about defense counsel in the presence of the jury. Some of the comments which the appellants contend were prejudicial were made outside the presence of the jury and may not, therefore, be considered. The only instance in which the court made adverse comments in hearing of the jury occurred when appellants' counsel called the district attorney to the stand and asked him whether he was being paid for his work at the trial. The court properly reproached him for these questions.

Appellant Franz additionally contends that the evidence, which he claims demonstrated conclusively that his only participation in the homicide was to throw an ashtray at the victim, fails to support the verdict of second degree murder. The record clearly discloses, however, that Franz, who attended a party across the street from the fraternity house, was intoxicated by the effects of alcohol and glue. When he learned that money and records might be had for the taking at the fraternity house, he went over there and returned with some records. He then returned to the fraternity house where he was later seen, acting in concert with his codefendants, approaching the victim on the bed with a large object in his hand. The victim subsequently died as a result of a number of severe blows inflicted upon his head and body. A large ceramic ashtray bearing Franz' fingerprints was found on the body and Franz later admitted to removing various objects from the house and to telling a number of people that he had beaten up on the victim. The circumstances which have been hereinabove reviewed in greater detail constitute substantial evidence of Franz' participation in the homicide.

Appellants Schwartzman and Franz contend that the prosecuting attorney committed prejudicial misconduct when he misstated the first degree felony-murder rule in the course of his closing argument. They appear to claim, in addition, that when a defendant goes from room to room within the premises controlled by his victim, transporting only articles which belong to the victim, this does not constitute burglary. Since the jury found none of the appellants guilty of first degree murder on the felony-murder theory, the district attor-

ney's descriptions of felony murder and burglary are irrelevant and any distortions in the statements of these rules could not have constituted prejudicial error. In other complained-of statements the district attorney was merely restating for the purpose of accuracy from evidence introduced at the trial.

Appellants Schwartzman and Franz finally contend that the court did not instruct the jury properly on the defense of diminished responsibility. The instruction given by the court fully explained to the jury the law of diminished responsibility. A similar, though less detailed, instruction has been approved by this court. (*People* v. *Oakley,* 251 Cal.App. 2d 520, 527 [59 Cal.Rptr. 478].)

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

The petition of appellants Schwartzman and Franz for a hearing by the Supreme Court was denied December 24, 1968.